IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

S))))))))))))))))Q
No. 93-2283
Summary Calendar

S))))))))))))))))Q

NATURAL GAS PIPELINE COMPANY
OF AMERICA, ET AL.,

                                        Plaintiffs,

NATURAL GAS PIPELINE COMPANY
OF AMERICA,

                                        Plaintiff-Appellee,

        versus


ENERGY GATHERING, INC., ET AL.,

                                        Defendants,

JOHN FOX,

                                        Movant-Appellant.


S)))))))))))))))))))))))))Q
Appeal from the United States District Court for the
Southern District of Texas
S)))))))))))))))))))))))))Q
September 21, 1993

Before GARWOOD, JONES and EMILIO M. GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant John Fox (Fox) is a Mississippi attorney who has

been the longtime associate, legal counsel, and business partner of

Navarro Crowson (Crowson), a judgment debtor who owes millions of

dollars to appellees, whom he defrauded.  Thus far, Crowson has

largely foiled his creditors' efforts to recover their judgments by concealing his assets and withholding documents that would reveal their extent and location. When Fox was ordered to turn over all Crowson-related business or financial records, he persistently failed to do so. The district court then ordered Fox to produce his personal tax returns for the last several years. Fox refused and was ultimately held in civil contempt pending compliance. Fox appeals, and we reverse in part and remand.

## Facts and Proceedings Below

Until his discharge in 1985, Crowson, a resident of Mississippi, was an employee of appellees Mitchell Energy and Development Corp. (Mitchell Energy), Southwestern Gas Pipeline, Inc. (Southwestern Gas), and Winnie Pipeline Co. (Winnie Pipeline). It is alleged that while so employed Crowson took bribes and kickbacks in connection with the negotiation of oil and gas contracts. Following a grand jury investigation, Crowson was indicted in federal court in Texas. Crowson's counsel in these criminal proceedings was Fox, an attorney and resident of Houston, Mississippi, who had represented and had extensive business dealings with Crowson since at least 1985. Crowson eventually pleaded guilty to several counts of mail fraud.

On September 14, 1988, appellees Texas Industrial Energy Co. (TICO), and South Gulf Energy, Inc. (South Gulf), sued Crowson in the United States District Court for the Southern District of Texas, Houston Division, to recover damages incurred as a result of the kickback scheme. Crowson having filed no answer, on June 21,

2

1991, appellees moved for a default judgment. On September 17, 1991, Fox entered an appearance in the litigation on behalf on Crowson to oppose the entry of judgment.[1] On September 23, 1991, default judgment was awarded to TICO and South Gulf for approximately $1.28 million.[2]

Having obtained their judgment, appellees attempted to discover the extent and location of Crowson's assets. Interrogatories and requests for production of documents were served upon Fox as Crowson's attorney of record. However, no answers or responsive documents were supplied. On January 15, 1992, the court ordered Crowson to respond to appellees' discovery requests. This order, too, was ignored. Finally, on June 8, 1992, the court held a show cause hearing at which Crowson was judged to be in contempt for failing to comply with post-judgment discovery and was incarcerated.

To gain release from contempt, on June 15, 1992, Crowson signed, and the court approved, an "Agreed Order," in which Crowson pledged to produce all of his financial and business records.[3] The

---

[1] Appellees assert that following his appearance on Crowson's behalf, Fox was served with all of the pleadings filed in the court below and received copies of all of the orders entered in the case. This is not denied by Fox and would be the normal course of proceeding in the court below.

[2] Appellees Mitchell Energy, Southwestern Gas, and Winnie Pipeline had also brought suit against Crowson in Texas state court and, on September 23, 1991, obtained a default judgment in excess of $4.75 million. After reaching a judgment collection agreement with TICO and South Gulf, these appellees intervened in the federal court action on January 15, 1993.

[3] The Agreed Order provided in part as follows:

"Crowson agrees to immediately turnover, and hereby authorizes third-parties to turnover or release, all of Crowson's financial or business records . . . to the United States Marshal Service and the representatives of TICO and/or South Gulf . . . including but not limited to the following . . ."

There followed twenty-five paragraphs describing in detail types of records to be produced, including:

"(i) All documents that reflect, evidence, relate or pertain to Crowson's or MEC's [Mississippi Energy Corporation, a Crowson entity] participation or ownership in any partnerships, joint ventures, corporations or other business entities in which Crowson or MEC hold either a direct or beneficial interest in from January 1, 1985 to the present.

(j) All documents that reflect, evidence, relate or pertain to any transfer of assets of any nature by Crowson or MEC, or any business entity or affiliate with whom Crowson or MEC have been employed or in which Crowson or MEC owns or owned a financial interest from January 1, 1985 to the present, as the actual or beneficial owner.

. . .

(t) All documents that reflect, evidence, relate or pertain to Crowson's or MEC'S, or any business entity's, affiliate's or corporation's with whom Crowson or MEC have been employed, or in which Crowson or MEC owns or owned a financial interest from January 1, 1985 to the present, transfers of assets of any kind, including, but not limited to, monies, jewelry, furs, automobiles, boats, charge cards, furniture, homes, condominiums or apartments since January 1, 1985.

. . .

(v) All contracts of any nature, including commission agreements, under which Crowson or MEC owns a legal or equitable interest in from January 1, 1985 to the present.

(w) Corporate records of any corporation that Crowson served as officer or director of from January 1, 1985 to the present.

. . .

4

Agreed Order also "authorize[d]" third parties to release such records. Finally, the Agreed Order provided that Crowson would be reincarcerated in the event that he failed to comply with its terms or to cooperate fully with post-judgment discovery. Crowson, however, evidently had no intention of complying with the Agreed Order and quickly began to violate it. The record indicates that sometime after his release, Crowson removed financial records from his accountant's files. In response, TICO and South Gulf applied for an *ex parte* order requiring the turnover of Crowson's assets and documents. On July 14, 1992, the court ordered Crowson, his agents and attorneys, to turn over all of his assets to the United States Marshal Service.[4] On July 21, 1992, the court held a

---

(y) All documents that reflect, evidence, relate or pertain to brokerage and commodities accounts, whether currently open, active or closed, in the name of Crowson or MEC, or any business entity, affiliate or corporation in which Crowson or MEC owns or owned a financial interest from January 1, 1985 to the present . . . ."

The order concluded by stating "ORDERED, that Defendants Navarro Crowson and Mississippi Energy Company shall comply with the terms and conditions of the agreed order."

[4] This order provided in part as follows:

"ORDERED, that Crowson, MEC, their partners, agents, servants, employees, attorneys, and all other persons in active concert or participation with Crowson or MEC who receive notice of this temporary restraining order shall be, and are hereby, enjoined from selling, conveying, assigning or otherwise transferring any of Crowson's or MEC's real property, personal property, income or other monies;

. . .

ORDERED, that Crowson and MEC shall immediately deliver all assets to the U.S. Marshal's service Houston Office until TICO's and South Gulf's judgment is fully

5

hearing to determine whether to revoke Crowson's conditional release from contempt for violating the Agreed Order. At the hearing, the court ordered Crowson to produce all of his financial records and to direct his agents to do the same by August 18, 1992.[5] The court did not, however, have Crowson reincarcerated.

---

satisfied;

. . .

ORDERED, that all financial institutions, investment companies, securities brokers, commodities brokers, accountants, attorneys or other third-parties, that have or currently hold, maintain or receive assets or income for Crowson or MEC shall immediately turnover such assets or income and, all documents relating to such assets or income upon the service of this order."

This order was predicated on a motion that invoked section 31.002 of the Texas Civil Practice & Remedies Code, paragraph (b) of which provides in part:

"The court may:

(1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;

(2) or otherwise apply the property to the satisfaction of the judgment; or . . . ."

With respect to Vernon's Tex. Ann. Civ. Stat. art. 3827a, the predecessor to section 31.002, it has been said that "[a]lthough a third party retains the property, if it is shown to be non-exempt, owned by a judgment debtor and subject to the debtor's possession or control, the trial court may issue and enforce its turnover order." *Norsul Oil & Mining v. Commercial Equipment Leasing Co.*, 703 S.W.2d 345, 349 (Tex. App.SQSan Antonio, 1985, no writ). Accord *Daniels v. Pecan Valley Ranch, Inc.*, 831 S.W.2d 372, 384 (Tex. App.SQSan Antonio, 1992, no writ) (section 31.002).

[5] The court stated, among other things, "Hamilton, Fox, the trustee for the children's trust, those people are all your agents, and they are to produce everything that has anything to do with anything that you having [sic] interest [in] or Mississippi Energy

6

Rather than complying with the various court orders requiring him to surrender his assets, Crowson repaired to Mississippi where he filed for bankruptcy and voluntarily committed himself to a mental hospital. Seeing through this ruse, the court ordered that Crowson be reincarcerated.

At the same time that Crowson was engaged in this abuse of the discovery process, appellees were meeting with little more success with Fox. On June 18, 1992, TICO and South Gulf representatives, accompanied by a United States Marshal, had the Agreed Order served upon Fox in his office in Houston, Mississippi. Fox, however, denied being in possession of any of Crowson's requested records and produced nothing. On July 7, 1992, appellees and a marshal returned to Fox's office. Fox again denied being in possession of any documents responsive to the Agreed Order.[6]

Subsequently, appellees discovered that Fox was the trustee of a trust, established in 1990 by Crowson, known as the Crowson Children's 1990 Trust (the Children's Trust). On September 14, 1992, the court ordered Fox to turn over all of the trust's assets, all documents related to the trust, and all assets in his possession belonging to Crowson (the Trust Order).[7] Fox responded to this order by filing an adversary proceeding in Crowson's

---

has interest[in] since 1985."

[6] Fox apparently offered to produce a box containing copies of court records from the lawsuit underlying this appeal, which appellees declined to accept.

[7] By this time, however, Fox had already liquidated and disbursed the trust's only remaining asset, a life insurance policy with a cash value of approximately $26,000.

7

bankruptcy action seeking a declaratory judgment that the Trust Order was null and void. The bankruptcy was subsequently transferred to the court below and dismissed.

On January 21, 1993, the court on its own motion ordered Fox to file a pleading clearly designating his capacity in the instant litigation. On February 5, 1993, Fox responded that he was not a party to the action and that, although he had made a brief appearance on Crowson's behalf in September 1991, he had since been replaced as Crowson's counsel by Bobby Mims, an attorney licensed in Texas.[8] Unconvinced, the district ruled that Fox's response was "inadequate" and that he "remains attorney of record for Navarro Crowson in this action."

On February 8, 1993, appellees filed a motion for sanctions against Fox, who was ordered to appear and show cause why he should not be sanctioned for failing to produce the Crowson records pursuant to the Agreed Order and for failing to turn over the assets of the Children's Trust pursuant to the Trust Order. The show cause hearing was held on March 15, 1993. At the hearing, appellees sought to expose the implausibility of Fox's earlier assertion that he had no documents responsive to the Agreed Order

---

[8]    Mims had first represented Crowson at the show cause hearing on June 8, 1992. The court's order of contempt entered after that hearing recites that "Crowson appeared for the hearing with new counsel, Bobby D. Mims. Fox never withdrew as Crowson's counsel. There has been no motion to substitute." The court added that "Crowson solicited new counsel to obstruct discovery and to dodge court orders." Mims also co-signed the Agreed Order with Crowson.

    Under the local rules of the district court, Fox, having been Crowson's only attorney, was counsel in charge, and could only withdraw "by motion and order, under conditions imposed by the court." S.D. Tex. Local R. 2(D).

by informing the court, on the basis of evidence obtained in this case in discovery from other sources, of Fox's extensive business dealings with Crowson. It was revealed, for example, that: the two maintained a joint account at a brokerage firm and had actively traded stocks together as Fox-Crowson Investments; that the two shared an interest in a condominium in Crested Butte, Colorado; and that Crowson had assigned to Fox a natural gas pipeline in Jefferson County, Texas.[9] The court also heard testimony about Fox's activities as Crowson's attorney. Not only had Fox prepared the Children's Trust, but he had been Crowson's lawyer in a divorce settlement within the last few years.[10] The evidence revealed that Fox's roles as attorney and business partner overlapped. For instance, Fox testified that Crowson had assigned him the gas pipeline as compensation for legal services, but that he (Fox) had forgotten about it.

It appears that this showing of Fox's deep involvement with Crowson as the latter's attorney and business partner convinced the court below of several things: that an agency relationship existed

---

[9] In other hearings, the court heard testimony that Fox and Crowson: had bought and sold real estate together, with a third person, as the partnership of Holleman-Fox-Crowson; owned "the Coke building" in Houston, Mississippi; and owned an oil rig in Alabama.

[10] Despite having denied in June and July of 1992 that he was in possession of any of Crowson's records, Fox, appellees asserted without contradiction, had subsequently appeared at a hearing in Crowson's bankruptcy action in Mississippi with copies of a property settlement from this divorce but had there claimed he obtained the documents from an unidentified third party.

between Fox and Crowson;[11] that documents relating to their joint ventures must surely exist;[12] that the disclosure of these documents would aid in the location of Crowson's assets;[13] and, finally, that Fox had purposefully withheld documents from the court.[14] Accordingly, the court ordered Fox to produce every document in his possession relating to Crowson or business he had done with Crowson. The court in this connection also required Fox to produce all of his own personal tax returns and schedules from 1984 to the

---

[11]     For example, the court stated: "Mr. Fox has been deemed by this Court to be an agent and alter ego of Mr. Crowson for the purposes of Crowson's records and activities. I think that conclusion is inescapable. . . ." The court also observed that Fox was Crowson's "alter ego in any number of ways" and "is a surrogate for Crowson."

[12]     The court stated: "it is inconceivable to me that out of this 18-year relationship there are not a whole lot of records."

[13]     The court stated: "it seems it's going to be necessary to reconstruct your life in order to find out how much of your life and how much of Mr. Crowson's overlap, and see if we can find some connections."

[14]     The court stated:

"[Fox] is doing what is classic discovery stall, so when [appellees] . . . find out about something, he will explain it; but there is nothing produced or explained until they find something from a third source.

. . .

        "And I thought the [Agreed] order made clear that you were to get the stuff if you didn't have copies.

. . .

        "When I made the mistake of being nice and letting [Crowson] out [of jail] for a little while, he went out and, with the help of Mr. Fox and other people, he moved stuff all around and in violation of every duty he owed everybody."

10

present.[15] The court commented in this regard:

> "Your personal tax returns reflect income from Mr. Crowson, partnerships with Mr. Crowson, and I don't know what else.
>
> "But Mr. Zivley [appellees' counsel] is going to know what else, because your tax returns show the treatment of property given to or received from Mr. Crowson. . . .
>
> . . . .
>
> "He is going to get your tax returns that show all the deals, so he can satisfy himself that there are not some other things that you don't recall, like this gas contract."

The court ordered that the motion for sanctions against Fox be carried over until April 12, 1993, at which time, if Fox had not complied with the court's order, he would be held in contempt.

Fox sought a stay from this Court. On April 8, 1993, we denied his motion on the ground that we lacked appellate jurisdiction.[16] On April 12, 1993, Fox filed a motion to withdraw as Crowson's counsel. The court had not ruled on this motion as of the preparation of the record on appeal.

On April 13, 1993, the show cause hearing resumed. As of that

---

[15]   The court's minutes from the hearing contain an order that "Fox shall produce his personal tax returns and schedules for 1984 to the present and all other documents relating to Crowson or business Fox did or could have done with Crowson."

[16]   A discovery order, even one directed at a non-party, is not a final order and hence not appealable. Prior to appeal, the one to whom the order is directed must first defy it and risk being held in contempt. If he is so sanctioned, the contempt order is appealable. *See, e.g.*, *In re Grand Jury Subpoena*, 926 F.2d 1423, 1430 (5th Cir. 1991); *Corporacion Insular de Seguros v. Garcia*, 876 F.2d 254, 256-58 (1st Cir. 1989); *FTC v. Alaska Land Leasing, Inc.*, 778 F.2d 577, 578 (10th Cir. 1985); 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2006, at 30 (1970).

11

time, Fox still had not produced any of the documents required of him. At the hearing, Fox initially agreed to turn over every record in his possession pertaining to Crowson, including his personal tax returns. After conferring with counsel, however, Fox recanted and declared that he would not produce his tax returns, at which point he was held in civil contempt. On April 15, 1993, we granted Fox a stay of the coercive portions of the order. Fox now appeals the court's judgment of contempt.[17]

### Discussion

On appeal, Fox primarily argues that the contempt judgment against him must be reversed because the court below had no authority under the Federal Rules of Civil Procedure to order him to produce his tax returns. Because this order was invalid, Fox maintains, its violation cannot constitute grounds for contempt. We will address this argument in Part I and Fox's other contentions in Part II.

---

[17] Fox attempted initially to notice an appeal on April 13, 1993. Realizing that the district court did not enter its judgment of contempt until April 14, 1993, Fox "re-noticed" his appeal on April 26, 1993, to cure any jurisdictional defect. Under 28 U.S.C. § 1826(b), an appeal from a judgment of contempt must be disposed of within thirty days. Although more than a month has passed, this appeal has been lawfully processed under established principles. First, eight circuits have held that time provisions of section 1826(b) do not apply if the contemnor is at liberty during the appeal. See *In re Grand Jury Proceedings (GJ90-2)*, 946 F.2d 746, 749 n.3 (11th Cir. 1991) (citing cases). According to this authority, only one circuit holds a contrary view. We believe the majority rule is a sound one. Second, before the expiration of the thirty-day period we entered an order extending the time for disposition of this appeal. This conforms to Fifth Circuit practice in section 1826(b) cases. See *In re Grand Jury Proceedings (Gavel)*, 605 F.2d 750, 752 n.1 (5th Cir. 1979) ("Where appropriate, we will enter an order extending the time within which the appeal must be decided.") (citing cases).

Fox argues that, because he is a non-party and because the documents at issue are located in Mississippi, Federal Rules 34 and 45 require that a subpoena for their production issue from a federal district court in Mississippi. Our inquiry must begin, however, not with Rule 34 or Rule 45, but with Rule 69, which governs the procedure for post-judgment discovery in federal courts. Rule 69 provides in relevant part as follows:

> "In aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held." Fed.R.Civ.P. 69(a).

Thus, Rule 69 allows post-judgment discovery to proceed according to the federal rules governing pre-trial discovery, or according to state practice.

Although Texas Civil Practice & Remedies Code § 31.002 has been construed to authorize turnover orders directed to third parties (see note 4 *supra*), the turnover contemplated thereby is only of property of the debtor and related records. Rule 621a of the Texas Rules of Civil Procedure, like Federal Rule 69, makes post-judgment discovery coextensive with pre-trial discovery.[18] Texas Rule of Civil Procedure 167(4), which governs the pre-trial

---

[18]    Rule 621(a) provides in relevant part:

> "At any time after rendition of judgment, . . . the successful party may, for the purpose of obtaining information to aid in the enforcement of such judgment, initiate and maintain . . . any discovery proceeding authorized by these rules for pre-trial matters." Tex. R. Civ. P. 621a.

production of documents by non-parties, provides, among other things, that a court may order a non-party to produce documents.[19] As stated below, we conclude that Texas practice only partially justifies the court's orders as applied to Fox. However, we first consider the federal rules and practice.

Fox's primary contention is that the court's order was not in keeping with Federal Rules 34 and 45. Rule 34 provides as follows:

> "A person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45." Fed. R. Civ. P. 34(c).

Thus, under Rule 34 a non-party may be compelled to produce documents in accord with Rule 45. That rule, which governs the issuance of subpoenas, contains the following key sentence:

> "If separate from a subpoena commanding the attendance of a person, a subpoena for production or inspection shall issue from the court for the district in which the production or inspection is to be made." Fed. R. Civ. P. 45(a)(2).

Relying on this text, Fox argues that a district court in Texas cannot order him to produce his tax returns, which are located in Mississippi.

We agree with Fox that a federal court sitting in one district cannot issue a subpoena *duces tecum* to a non-party for the

---

[19]    Texas Rule 167(4) provides in relevant part:

> "The court may order a person, . . . not a party to the suit to produce in accordance with this rule. However, such order shall be made only after the filing of a motion setting forth with specific particularity the request, necessity therefor and after notice and hearing. All parties and the nonparty shall have the opportunity to assert objections at the hearing." Tex. R. Civ. P. 167(4).

14

production of documents located in another district. *Cf. In re Guthrie*, 733 F.2d 634, 637 (4th Cir. 1984). The fact that the court could not subpoena Fox's records under Rule 45, however, does not necessarily compel Fox's conclusion that the order at issue was invalid. After all, no subpoena was issued in this case; instead, the district court issued a direct order to Fox to produce his tax returns. At the end of the day, Fox's argument merely establishes that the court's order must be justified with reference to something other than Federal Rules 34 and 45. Appellees contend that the court order was a permissible exercise of the inherent power with which all federal courts are vested.

For nearly as long as the federal courts have existed, it has been understood that "[c]ertain implied powers must necessarily result to our courts of justice from the nature of their institution," powers "which cannot be dispensed with in a court because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34 (1812). *See also Anderson v. Dunn*, 6 Wheat. 204, 227 (1821). The Constitution itself confers this authority upon all Article III courts as an incident to "The judicial Power." U.S.Const., Art. III, § 1; see *Chambers v. NASCO, Inc.*, 111 S.Ct. 2123, 2140 (1991) (Scalia, J., dissenting); 1 J. Moore, *Moore's Federal Practice* ¶ 0.60[6], at 637 (2d ed. 1988). The inherent powers of the federal courts are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 82 S.Ct.

15

1386, 1389 (1962). At the same time, however, these powers must be exercised "with restraint and discretion." *Roadway Express, Inc. v. Piper*, 100 S.Ct. 2455, 2463 (1980). As we have said, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *quoted with approval and aff'd*, 111 S.Ct. 2123, 2131 (1991). In short, the inherent power springs from the well of necessity, and sparingly so.

Fox in essence argues that the Federal Rules of Civil Procedure completely describe the federal courts' power over civil procedure, displacing any inherent authority in this area. We cannot agree. As Judge Posner remarked concerning the relationship of inherent powers to positive law: "The motto of the Prussian stateSQthat everything which is not permitted is forbiddenSQis not a helpful guide." *United States v. Torres*, 751 F.2d 875, 880 (7th Cir. 1984). A long line of cases establishes that the Rules are not always the exclusive source of a federal court's powers in civil cases. In *Link v. Wabash, supra*, the Supreme Court held that a district court has inherent power to dismiss a case *sua sponte* for failure to prosecute, even though Federal Rule 41(b) only provides for such dismissal on a defendant's motion. 82 S.Ct. at 1388-89. In *Chambers v. NASCO, supra*, the Court held that the inherent power to impose sanctions for bad-faith conduct during litigation was not displaced by, and went beyond, such sanctioning

16

mechanisms as Rule 11 and 28 U.S.C. § 1927. 111 S.Ct. at 2134-36. Supportive cases can also be found among the decisions of the courts of appeals. In *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 650-53 (7th Cir. 1989) (en banc), the court held that a district court has inherent power to order litigants to appear at a pre-trial settlement conference despite the fact that Rule 16(a) provides only that a court may direct a party's *attorneys* to attend such a conference. The court stated:

> "[T]he Federal Rules of Civil Procedure do not completely describe and limit the power of the federal courts. . . .
>
> "The concept that district courts exercise procedural authority outside the explicit language of the rules of civil procedure is not frequently documented, but valid nevertheless. . . .
>
> . . .
>
> ". . . [T]he mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition." *Id*. at 651, 652.

For similar statements, *see, e.g.*, *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989); *Landau & Cleary, Ltd. v. Hribar Trucking, Inc.*, 867 F.2d 996, 1002 (7th Cir. 1989); *HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 915 (1st Cir. 1988); *Black Panther Party v. Smith*, 661 F.2d 1243, 1281 & n.4 (D.C. Cir. 1981) (MacKinnon, J., concurring in part and dissenting in part), *vacated as moot*, 102 S.Ct. 3505 (1982).[20]

---

[20] There is an apparent tension between the cited cases and *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 78 S.Ct. 1087 (1958). In *Rogers*, the district court dismissed a complaint for failure to comply with a discovery order and the court of appeals affirmed. The district

We note, however, that although a court may have inherent power to do that which is not specifically provided for in the Rules, it may not do that which the Rules plainly forbid. Congress has the power to abrogate a lower court's inherent authority, although it must adequately express its intent to do so. See *Chambers*, 111 S.Ct. at 2134; *Link*, 82 S.Ct. at 1389. Where such an expression has been made, a court "may not exercise its inherent authority in a manner inconsistent with rule or statute." *G. Heileman Brewing*, 871 F.2d at 652. "That is, where the rules directly mandate a specific procedure to the exclusion of others, inherent authority is proscribed." *Landau & Cleary*, 867 F.2d at 1002. *See also United States v. One 1987 BMW 325*, 985 F.2d 655, 661 (1st Cir. 1993); *Strandell v. Jackson County*, 838 F.2d 884, 886 (7th Cir. 1987).[21]

---

court relied upon Rule 37(b) and its inherent power, and the court of appeals affirmed on the basis of Rule 41(b) and inherent power. The Supreme Court reversed. Writing for the Court, Justice Harlan held that "whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively on Rule 37," adding that "[r]eliance upon Rule 41 . . . or upon 'inherent power,' can only obscure [the] analysis." *Id*. at 1093. As we read *Rogers*, however, the real issue was whether Rule 37 or Rule 41 applied to dismissals for discovery abuse, not whether the Rules limit inherent power. Indeed, just four years later the Court in *Link*, again per Justice Harlan, held that the inherent power to dismiss a case for want of prosecution is broader than Rule 41(b). No justice in *Link* suggested it was inconsistent with *Rogers*. *See also Chambers*, 111 S.Ct. at 2135 & n.14 (arguing that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct" and that *Rogers* "is not to the contrary").

[21]     Even where the exercise of inherent power would not violate an applicable rule, a court is not *required* to use that power where a party has failed to avail himself of the devices contained in the Rules. See *McGill v. Duckworth*, 944 F.2d 344, 353-54 (7th Cir. 1991), *cert. denied*, 112 S.Ct. 1265 (1992).

Here, the court's order was not in violation of the relevant rules because those rules, as was the case with Rule 41(b) in *Link*, contain only "permissive language." *Link*, 82 S.Ct. at 1388. Rule 69(a) provides that post-judgment discovery "may" be obtained in the manner provided in the Rules. Similarly, Rule 34(c) provides that a non-party "may" be compelled to produce documents per the terms of Rule 45. In sum, Rule 69(a) and Rule 34(c) do not purport to define the sole means of obtaining post-judgment document discovery or production from a non-party.

Having concluded that the Rules of Civil Procedure do not foreclose the possibility that the court's orders might be justified as an exercise of inherent power, we now turn to whether the court in fact had such power. We first consider whether the order fell within the ambit of those inherent powers possessed by the courts to conduct discovery not recognized by rule or statute. In the civil[22] context, for example, it has been held (or stated in dicta) that courts have inherent power to issue such discovery orders as are necessary for a court to determine and rule upon its own jurisdiction,[23] to permit the taking and filing of post-trial depositions,[24] to subpoena witnesses for indigent civil litigants

---

[22] Criminal courts, too, possess some inherent discovery power. *See, e.g.*, *United States v. Nobles*, 95 S.Ct. 2160, 2166-67 (1975) (both prosecution and defense can be compelled to produce the previously recorded statements of its witnesses).

[23] *See United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 108 S.Ct. 2268, 2272 (1988); *United States v. Shipp*, 27 S.Ct. 165, 166 (1906).

[24] *See United States v. Altech, Inc.*, 929 F.2d 1089, 1091-92 (5th Cir. 1991).

19

who cannot tender fees,[25] to issue letters rogatory to foreign courts,[26] and to order some forms of discovery in extradition,[27] forfeiture,[28] and habeas corpus[29] proceedings.[30]

We decline today to add to this list a broad, general power to order non-parties beyond the forum district to produce documents.[31] "Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express*, 100 S.Ct. at 2463. Accordingly, an argument for the existence of such a power must be grounded on more than mere judicial convenience. We have said that the inherent power

---

[25] *See Gibbs v. King*, 779 F.2d 1040, 1046-47 (5th Cir.), *cert. denied*, 106 S.Ct. 1975 (1986); *Lloyd v. McKendree*, 749 F.2d 705, 707 (11th Cir. 1985); *Estep v. United States*, 251 F.2d 579, 580 (5th Cir. 1958).

[26] *See In re Letter Rogatory*, 523 F.2d 562, 563 (6th Cir. 1975); *United States v. Reagan*, 453 F.2d 165, 173 (6th Cir. 1971), *cert. denied*, 92 S.Ct. 2049 (1972); *United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958); 8 Wright & Miller, *supra*, § 2083, at 351.

[27] *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Quinn v. Robinson*, 783 F.2d 776, 817 n.41 (9th Cir.), *cert. denied*, 107 S.Ct. 271 (1986); *First Nat'l City Bank of New York v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960), *vacated as moot*, 84 S.Ct. 144 (1963). *But see In re Extradition of Singh*, 123 F.R.D. 108, 115-16 (D.N.J.1987).

[28] *See United States v. Porcelli*, 1992 U.S. Dist. Lexis 17928 (E.D.N.Y. Nov. 5, 1992) (third-party petitioner in forfeiture proceeding may obtain discovery of documents from defendant-forfeitor).

[29] *See Harris v. Nelson*, 89 S.Ct. 1082, 1086 (1969) (court may compel answers to interrogatories in habeas proceedings).

[30] *But see Miner v. Atlass*, 80 S.Ct. 1300, 1303 (1960) (admiralty courts have no inherent power to allow the taking of depositions).

[31] Nor should our compilation of this list be construed as an endorsement of any of those decisions that we are not bound to follow.

20

"doctrine is rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (citing *Ex parte Peterson*, 40 S.Ct. 543 (1920)).[32] One such chancery tool was the bill of discovery, which has been called the forerunner of all modern discovery procedures. *See Hickman v. Taylor*, 67 S.Ct. 385, 395 (1947) (Jackson, J., concurring). Potent as it was, however, the bill of discovery could not be used to obtain documents (or other discovery) from someone who was not a party. *See* 6 J. Wigmore, *Evidence* § 1859f, at 594-95 (J. Chadbourn rev. ed. 1976); *id*. § 1856d, at 562 & n.1 (citations); G. Ragland, *Discovery Before Trial* 16 (1932); Welling, *Discovery of Nonparties' Tangible Things Under the Federal Rules of Civil Procedure*, 59 Notre Dame L.Rev. 110, 134 & n.125 (1983); *Crew v. Saunders*, 2 Str. 1005 (1735). Thus, although federal courts are vested with certain inherent discovery powers owing to the equitable power of Chancery

---

[32] Several other courts have quoted this language with approval. *See In re Villa Marina Yacht Harbor, Inc.*, 984 F.2d 546, 548 (1st Cir.), *petition for cert. filed* (May 24, 1993); *Aoude*, 892 F.2d at 1119; *In re San Juan DuPont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1011 n.2 (1st Cir. 1988); *HMG Property*, 847 F.2d at 915; *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 563 (3d Cir. 1985) (en banc). *Cf*. *Hall v. Cole*, 93 S.Ct. 1943, 1946 (1973) (inherent power to award attorney's fees "'is part of the original authority of the chancellor to do equity in a particular situation'") (quoting *Sprague v. Ticonic Nat'l Bank*, 59 S.Ct. 777, 780 (1939)).

courts to issue bills of discovery,[33] we conclude that there is no broad, general inherent power to order a non-party beyond the district to produce documents.[34]

However, here, as the district court noted, "Fox is not a third party," but was rather Crowson's attorney of record in this very case, as well as his agent and attorney in other respects. *See also* note 11 *supra*. In these circumstances, we hold that Texas practice and the court's inherent powers combined to authorize the court to require Fox to turn over Crowson-related records, as specified in the June 15 Agreed Order. Fox argues that the Agreed Order only "authorizes" third parties to turn over Crowson's documents, but does not require them to do so. This was plainly not the plaintiffs' or the district court's understanding of the Agreed Order, as it applied to Fox. Crowson himself had testified at the July 21, 1992, hearing that, following the entry of the Agreed Order, "I called Mr. Fox the very first thing, and I told Mr. Fox that, as far as I was concerned, he needed to release any files that he had." In any event, the district court subsequently

---

[33]    *See McMullen Lumber Co. v. Strother*, 136 F. 295, 301 (8th Cir. 1905) ("That bills for discovery and relief inhered in the ancient jurisdiction of courts of chancery in England at the time of the adoption of the federal judiciary act is beyond question. This being so, the like jurisdiction inheres in the federal courts, unless abolished by statutes, changed or modified by some rule adopted by the Supreme Court.").

[34]    A court might well have inherent power to order a *party* to produce pertinent documents. *See Producers Releasing Corp. de Cuba v. PRC Pictures, Inc.*, 176 F.2d 93, 95 (2d Cir. 1949) ("[I]t seems very reasonable to suppose that a court has inherent power to compel a party to produce, without the issuance of a subpoena, documentary evidence within his control and known to be relevant.").

22

made fully clear to Fox at the March 15, 1993, hearing that he was required to turn over all of Crowson's records responsive to the Agreed Order.[35] Moreover, we conclude that the combined authority of Texas Civil Practice & Remedies Code § 31.002 (note 4 *supra*) and Texas Rule 167(4) (note 19 *supra*) empowered the court to so order Fox, and that, as applied to Fox, after March 15, 1993, any failure to comply with all the procedural requirements of those provisions was not substantially prejudicial.

These considerations, however, do not suffice to sustain the district court's order that Fox produce his personal tax returns. This order, unlike the requirement that Fox produce Crowson's records, had never been requested by any of the parties and was ordered by the district court entirely *sua sponte*. For this reason, it is not within Texas Rule 167(4). Fox's own tax returns are not sufficiently related to his dealings with Crowson and thus, for the purposes of an order for their discovery, Fox would stand in the shoes of a non-party. The order is therefore not within section 31.002, which applies only to the debtor's property and records.

The district court may have ordered Fox to produce his tax returns as a sanction for refusing to comply with discovery orders. If possible and within reason, we will construe the district court's actions in a favorable (that is to say permissible) light. We review a court's imposition of sanctions for abuse of

---

[35] Additionally, the court's July 14, 1992, turnover order (*see* note 4 *supra*) clearly required Fox to turn over Crowson's records (as did the July 21, 1992, order; *see* note 5 *supra*).

23

discretion.  *Chambers v. NASCO, Inc.*, 111 S.Ct. 2123, 2138 (1991).

A review of the record persuades us that Fox's evasiveness and intransigence justified sanctions.  The district judge found that Fox had disobeyed three separate turnover orders, two of which were entered before the March 15, 1993, order to Fox to produce his personal tax returns.  The March 15, 1993, and April 13, 1993, hearings were noticed so as to include sanctions for failure to comply with the prior orders, including the Agreed Order of June 15, 1992.  As previously noted, at least by the March 15, 1993, hearing, it was made plain to Fox by the court that the Agreed Order required him to turn over Crowson's records.  At the April 13, 1993, hearing, Fox admitted that he still had not done this.  Fox's failure to produce Crowson's records was a violation of the court's orders and of his duties as Crowson's attorney.  Fox's motion to withdraw as counsel, filed on April 12, 1993, the day before he was held in contempt, has not been granted by the court below and is too little too late.[36]  Fox remains an officer of the court until he is discharged or the litigation comes to an end.  It is clear that the district court was justified in concluding that Fox had been evasive[37] and that, without some sanction, he could not be relied on to produce all the records of his extensive financial relationship with Crowson.  Based on Fox's status as Crowson's

[36]    As also was his April 13 offer to produce Crowson's records.

[37]    Fox claimed he did not understand the Agreed Order to refer to records such as deeds and the like, although it obviously did (*see* note 3, *supra*).  The district court was also obviously concerned about Fox's having purportedly forgotten about certain of his transactions with Crowson.

24

agent, as well as the unique position he occupied as Crowson's attorney, the trial court had reasonable grounds to sanction Fox for his failure to comply with the post-judgment discovery and turnover orders related to the Crowson documents and assets.

When parties or their attorneys engage in bad faith conduct, a court should ordinarily rely on the Federal Rules as the basis for sanctions. *Chambers*, 111 S.Ct. at 2136. The Federal Rules do not explicitly provide an avenue to sanction attorneys who fail to comply with discovery orders. Rule 37(b)(2) is clearly directed to party failure to obey discovery orders, not attorney failure, although the attorney is subject to sanctions for obstructive advice.[38] There is, however, no finding of such advice by Fox. Furthermore, Fox had signed no objectionable court papers or discovery objections that might give rise to Rule 11 or Rule 26(g) sanctions. We find no sanction under the Federal Rules directly applicable to Fox's misconduct.

It was therefore proper for the district judge to resort to his inherent powers to discipline Fox's intransigence and complicity in his client's scandalous behavior. The inherent power to sanction bad faith conduct must extend to reach individuals and conduct not directly addressed by other mechanisms. *Chambers*, 111 S.Ct. at 2134. Although it is unclear whether the inherent power

---

[38] "[T]he court shall require the party failing to obey the [discovery] order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2).

25

to sanction discovery abuses extends to abuses committed by non-parties,[39] there is no doubt that this power may be applied to attorneys in the case. "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 n.10 (5th Cir.), *cert. denied*, 88 S.Ct. 2287 (1968), *cited with approval in Roadway Express*, 100 S.Ct. at 2464 n.12; *see also Roadway Express*, 100 S.Ct. at 2464 ("The power of a court over members of its bar is at least as great as its authority over litigants.").

Although it was proper to invoke inherent powers to sanction Fox, the district judge abused his discretion by ordering Fox to produce his personal tax returns and schedules. *See Chambers*, 111 S.Ct. at 2132 (because of their potency, inherent powers must be exercised with restraint and discretion). Income tax returns are highly sensitive documents; courts are reluctant to order their

---

[39]     We have found no cases sanctioning non-parties for abusing the discovery process. In *In re Rainbow Magazine, Inc.*, 136 B.R. 545, 553 (Bankr. 9th Cir. 1992), the court reversed the lower court's assessment of attorney's fees against a non-party because it had "uncovered no cases imposing sanctions against a non-party under th[e bad-faith] exception to the American Rule." In *Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492, 494-95 (9th Cir. 1983), the court seemed to accept that attorney's fees could be assessed against a non-party but reversed a lower court order doing so for failure to find bad faith on the part of the non-party. Finally, in *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 121 F.R.D. 264 (M.D.N.C. 1988), although the court stated that "[t]he Court also has inherent power to impose sanctions on parties, non-parties or attorneys who violate discovery orders," *id*. at 267, the sanctions were being sought against a party, not a non-party, and were ultimately denied.

26

routine disclosure as a part of discovery. *SEC v. Cymaticolor*, 106 F.R.D. 545, 547 (S.D.N.Y. 1985) (disclosure of tax returns for purposes of discovery ordinarily demands that the requesting party demonstrate relevancy and compelling need). Not only are the taxpayer's privacy concerns at stake, but unanticipated disclosure also threatens the effective administration of our federal tax laws given the self-reporting, self-assessing character of the income tax system. *Commodity Futures Trading Commission v. Collins*, 62 U.S.L.W. 2059, 2060 (7th Cir. July 7, 1993).

The intrusive nature of the sanction is compounded by its novelty. Although novel sanctions are not objectionable per se, they are subject to close examination on review simply because their reasonableness has not been demonstrated.

Several factors contribute to the order's unreasonableness. The district judge ordered Fox to produce his tax returns *sua sponte*. The judgment creditors had never included them in their discovery requests, a fact that suggests that the returns were believed inaccessible or irrelevant for the creditors' purposes. No evidence came to light in the sanction hearings that proved the particular usefulness of Fox's tax returns to indicate Crowson's financial position. The court engaged in a fishing expedition. Fox could not have anticipated that his conduct would result in such a sanction.

Further, the judge's order neither provided Fox with the opportunity to expunge sensitive or irrelevant portions of his returns before exposing them to opposing counsel, nor did it permit

27

a review of the record *in camera* to protect their privacy.  Even with such protections, however, a sanction that penalizes errant lawyers by demanding their personal tax returns risks untoward consequences.  The threat of sanctions in the form of forced disgorgement of private information subjects uncooperative attorneys to judicial bludgeoning and humiliation above and beyond the consequences of a monetary order or an order directly related to the court proceedings.

The ultimate touchstone of inherent powers is necessity. Given the post-judgment posture of this case, the scandalous behavior of Crowson, and the evident complicity of Fox, his attorney, in the case, we concur that sanctions should have been imposed on Fox.  Necessity did not, however, compel a *sua sponte* order to produce Fox's personal tax returns.  Traditional sanctions SQperhaps a monetary penalty that increased each day for Fox's noncompliance with the other post-judgment discovery ordersSQwould have accomplished the court's purpose more properly.[40]

### Conclusion

For these reasons, the portion of the district court's order of March 15, 1993, directing Fox to turn over his personal tax returns (and the schedules thereto) for the years 1984 to the present is reversed, and, likewise, so much of the Civil Contempt

---

[40]    Fox challenges the court's order as based upon impermissible *ex parte* communications.  Fox was held in contempt only after receiving notice and two hearings on the record.  At both hearings, Fox gave testimony and was represented by counsel.  Fox received due process.  *Cf. Holcomb v. Allis-Chalmers Corp.*, 774 F.2d 398, 401 (10th Cir. 1985).

28

Judgment signed April 14, 1993, as finds Fox in contempt for failing to turn over his said personal tax returns (and schedules), and as imposes confinement or other coercion until he does so, is also reversed. We find no fault with the balance of the March 15, 1993, order. We remand the balance of the April 14, 1993, Civil Contempt Judgment for reconsideration in light of our ruling as to Fox's personal tax returns.[41]

REVERSED in part and REMANDED

---

[41] Nothing in this opinion precludes sanctions against Fox (other than for his failure to produce his personal tax returns); nor is resort to subpoena from the appropriate United States District Court in Mississippi precluded.