IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30851

_____


LARRY D. CROWE, ET AL.,

Plaintiffs,

versus

JAMES W. SMITH, ET AL.,

Defendants,

MICHAEL P. TONE; ANNE FIEDLER;
ROBERT B. BIECK, JR.; JAMES W.
BERRY; WILLIAM E. WRIGHT;
JUDY L. BURNTHORN; W. GLENN
BURNS; AMERICAN CASUALTY COMPANY
OF READING, PENNSYLVANIA,

Appellants.

_____

Appeals from the United States District Court for the
Western District of Louisiana
_____

August 12, 1998

Before JOHN R. GIBSON,[*] JOLLY, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

American Casualty Company of Reading, Pennsylvania ("CNA"[1]),

Michael P. Tone, Anne Fiedler, W. Glenn Burns, Robert B. Bieck,

Jr., William E. Wright, Judy L. Burnthorn, and James W. Berry

---

[*]Circuit Judge for the Eighth Circuit, sitting by designation.

[1]"CNA" is an acronym for a group of insurance companies, one
of which is American Casualty Company--the "A" in "CNA."
Continuing the practice of the parties and the district court, we
will refer to American Casualty Company as CNA in this opinion.

(collectively, the "sanctions defendants") appeal the imposition of sanctions against them by Judge Nauman S. Scott of the Federal District Court for the Western District of Louisiana.

All of the defendants are attorneys except for CNA. After the settlement of an underlying civil action in which these attorneys were involved as either defense counsel or insurer's counsel, the district court was advised by the plaintiffs that an applicable insurance policy issued by CNA (the "D&O Policy") had not been disclosed to them, although its existence had long been known to the sanctions defendants. The district court appointed the attorney for the plaintiffs in the underlying case to investigate and present evidence to the court of the offense. After the conclusion of a civil bench trial, the district court entered an extensive opinion, which included numerous findings of fact and conclusions of law. Briefly stated, the district court held that the sanctions defendants willfully conspired to defraud the plaintiffs by concealing the D&O Policy despite having discovery-related, ethical, and other duties to disclose it. Acting under its inherent power, the court then imposed sanctions consisting of fines, reprimands, and suspensions from the practice of law. In particular, it imposed fines of $5 million on CNA and $75,000 on Tone. All fines were made payable to the district court.

We hold that the district court abused its discretion by imposing serious criminal sanctions on CNA and Tone via a manifestly civil process. The sanctions against those defendants are therefore reversed. Furthermore, and although we find the procedure to have been adequate as to the suspended and reprimanded

defendants, we also hold that the district court abused its discretion as to all of the sanctions defendants, save the defendant Berry, in finding that they engaged in bad faith conduct by failing to disclose the D&O Policy.  Because a finding of bad faith is a prerequisite to the exercise of a court's inherent power, we therefore reverse the district court's judgment as to defendants Burns, Bieck, Wright, Fiedler, and Burnthorn as well. In addition, as to defendants CNA, Tone, Fiedler, and Burnthorn, we also hold that the record is completely insufficient to support a finding of bad faith conduct.  As to those defendants, the sanctions proceeding is dismissed.  With respect to defendants Burns, Bieck, and Wright, we find the record potentially sufficient to support a finding of bad faith conduct, and remand the case to the district court for further consideration in the light of our opinion.  We affirm the sanctions imposed against Berry.

I

The sanctions proceeding in this case concerned the actions of several attorneys during a period of time leading up to the signature of a settlement agreement in a civil RICO[2] suit.  To understand the significance of those actions, it is necessary briefly to review the circumstances of that case.

In December 1992, as the latest installment of a long and tangled saga of partnership litigation, Larry D. Crowe and the

---

[2]Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO").

Succession of Reba Coody Crowe (the "Crowes") brought suit against James W. "Sonny" Smith in the Federal District Court for the Western District of Louisiana. The Crowes alleged, among other things, that Smith, who was a former business partner of Larry Crowe, conspired with Peoples Homestead Savings and Loan Association of Monroe, Louisiana, ("Peoples") to defraud the Crowes of their interest in certain commercial agricultural property in violation of RICO. Also made defendants in this suit were Russell Hart, the former president of Peoples, and several of Peoples's former directors and outside attorneys. Eventually, the case was set for trial on July 12, 1994, in Monroe, Louisiana.

Most of the sanctions defendants served as defense counsel in the 1992-94 litigation. Berry represented four former directors of Peoples. Bieck, Wright, Burnthorn, and Burns represented various of the outside attorneys. The remaining individual sanctions defendants, Tone and Fiedler, represented CNA as coverage counsel and were not directly involved in the case. The following chronology traces the activities of these attorneys in the months leading up to the trial. It is based on the factual findings of the district court, which in all relevant respects are undisputed.

Late into the litigation--in March 1994--as part of his research for the upcoming trial, Bieck made a fateful discovery among the files of one of the attorney defendants. He learned that in 1983, CNA had issued a directors' and officers' errors and omissions policy--the D&O Policy--to Peoples. This policy was a

4

"claims made" policy, and carried a general liability limit of $5 million.   It expired in 1986, but not before Larry Crowe had brought suit against Peoples under a conversion theory in February of that year.[3]  Shortly thereafter, the directors of Peoples began corresponding with CNA regarding Crowe's claims.[4]  It was this correspondence that Bieck discovered in March 1994.  He conveyed his findings almost immediately to Burnthorn.

Three weeks later, the Crowes issued certain discovery requests to counsel for each of the director defendants and one of the attorney defendants, Johnny Dollar.[5]  Dollar was represented, significantly, by Wright and Burnthorn.  The discovery requests in question were for the production of certain described documents. Two are relevant to this case:

> 5.  All claims or notices of claim that were transmitted to any of your insurance carriers in relation to any of the claims of Larry Crowe and/or the Succession of Reba Crowe.
>
> 8.  All indemnity agreements related to service as bank officer, director, attorney, or representative.

---

[3]This suit was an earlier chapter in the same epos of litigation to which the 1992 suit belonged.  A successor to the 1986 suit eventually settled, resulting in a complex transfer of funds, property rights, and liabilities between Peoples and Larry Crowe.

[4]At about this time, CNA opened a file for the Crowe litigation.

[5]Dollar was included in this request because he had subsequently served on Peoples's board of directors.

5

It is important to note that these discovery requests were very significant ones in the Western District in 1994. Although Fed. R. Civ. P. 26(a)(1)(D) generally provides for the automatic disclosure of relevant insurance policies, the Western District had opted out of that provision in its local rules. See ULLR 6.06W (1994). At the time, the only way for a party to find out about insurance policies in the Western District was by way of a properly propounded discovery request.

On April 27, Berry responded to the discovery requests on behalf of three of his four director clients. He answered Requests 5 and 8 with the words "none" or "none known." On that same day, Burnthorn faxed Berry a copy of the CNA correspondence first discovered by Bieck. At this point, Burnthorn also began preparing a letter to CNA requesting defense and indemnification for her client, Dollar, under the D&O Policy. On April 28, she faxed Berry a copy of this letter as well, so that he could use it as a model for letters written on behalf of his clients. On April 29, one of Berry's director clients sent such a letter to CNA. Letters from two of the other directors followed soon thereafter.

On May 1, Burnthorn responded to the discovery requests on behalf of Dollar. Her response to Request 5 read as follows:

> Response to request #5: New England Insurance Company and the Home Insurance Company have been notified of plaintiff's lawsuit. Dollar objects to the request on grounds of attorney-client privilege and work product immunity.

6

On May 5, Berry responded to the discovery requests on behalf of his fourth and final director client. His answers to Requests 5 and 8 for this client were identical to the ones he had sent the week before on behalf of the other directors--in the negative.

On May 12, Fiedler wrote to Burnthorn advising that CNA was proceeding under a reservation of rights with respect to the D&O Policy, and requesting certain additional information. On June 7, Burnthorn provided this information.

As the trial drew nearer, settlement negotiations intensified. On June 23, Berry made a written offer to settle on behalf of the directors for $10,000. He emphasized in this letter that his clients were not insured, and did not have access to substantial funds for settlement purposes. The Crowes counter-offered for $25,000.

On June 30, CNA made a formal response to the notice of lawsuit letters sent by Berry's and Burnthorn's clients. CNA advised that the D&O Policy was a $5 million indemnity policy that might not provide coverage for several reasons, and that CNA would be proceeding under a reservation of rights to deny coverage. A specimen policy was attached to the responses.

During the week of July 4, Wright, Bieck, and Burns attempted to negotiate a settlement on behalf of their clients and two other insurers.[6] Their offer was rejected, whereupon they discussed

---

[6]New England Insurance Company and Home Insurance Company, the two insurers referenced in Burnthorn's above-quoted discovery

among themselves the possibility of coverage under the D&O Policy and the feasibility of bringing CNA and Berry's director clients into a global settlement. On July 7, Wright informed Bieck that he would be speaking with CNA representatives the next day about the possibility of CNA contributing to a global settlement. On July 8, the telephone conference took place as scheduled, with Berry, Wright, Tone, and Fiedler in attendance. During the conversation, Tone stated that he had not yet received authority to commit any money to a settlement fund, and that no one should raise the possibility of a CNA contribution with the Crowes. Wright subsequently relayed the substance of this conversation to Bieck.

On July 11, the day before the trial began, Tone wrote to Wright and Berry informing them that CNA was willing to contribute to a settlement package. On this same day, and obviously before receiving the letter, Wright, Bieck, and Burns met to discuss the possibility of making a global settlement offer, which would include CNA, prior to the commencement of the trial. In this conversation, Wright reminded Burns and Bieck that CNA had requested that its possible inclusion in a global settlement not be disclosed. Later that afternoon, Wright, Bieck, and Burns, along with Smith's attorney, met with the Crowes' counsel to discuss settlement. The Crowes made an offer of $6.2 million. Burns

response.

8

replied that this figure was far beyond any theory of insurance coverage. No one at the meeting objected to this statement.

The trial began as scheduled on July 12. Shortly thereafter, Berry spoke to Tone regarding the payment of his fees by CNA. On July 13, Tone sent a letter to Berry advising him that CNA would pay $25,000 for the legal fees of his clients. Later that same day, Berry continued to pursue his $10,000 settlement offer with the Crowes' counsel. During these discussions, one of the Crowes' lawyers remarked that he was surprised that the directors had no insurance. Berry replied that there was an old policy, but that it had lapsed and his clients were not covered by it.

At this point, Burns became the chief settlement negotiator for all of the defendants. On July 21, Burns received word from Berry that CNA had given Tone authority to make a $100,000 contribution to the settlement. Berry also relayed that Tone had reiterated his request that the source of the $100,000 remain anonymous.

At a meeting on July 26, Wright reminded Bieck and Burns of CNA's request for anonymity. The three discussed the matter, and agreed that CNA's participation ought to be revealed. They also decided that discovery responses should be checked to see if anyone had breached a duty to disclose the D&O Policy. Bieck raised particular concern about Berry's discovery responses. The meeting was then adjourned to check those responses. Wright consulted with Burnthorn about the responses they had given, and concluded that

9

they were adequate. Bieck, Wright, and Burns each attempted to check Berry's responses, but apparently none of them had brought those documents along. No one followed up on this with Berry.

On July 27, Tone and Fiedler arrived in Monroe to monitor the settlement progress directly. On this day, they were able to have a number of discussions with various of the defense counsel during breaks in the ongoing trial. First, Berry asked Tone to increase the amount of CNA's contribution. Tone had authority to do this, and accordingly upped CNA's offer to $150,000. Tone then raised the subject of disclosure and was informed by Hart's[7] attorney that the settlement would fall apart if CNA were revealed. After these exchanges, Burns informed the Crowes' counsel that the attorney and director defendants would meet the Crowes' prior settlement offer of $2.25 million. Back in the defense camp, the subject of disclosure arose one last time. Wright told Tone that he thought CNA's contribution should be revealed. Tone apparently concurred. Tone and Fiedler then departed Monroe.

The Crowes accepted the $2.25 million offer, and the substance of the agreement was recited to the court that same day by Burns. The court recessed the trial so that a final written agreement could be prepared and signed. Bieck subsequently drafted that agreement. In it, the name "American Casualty Company" appeared once, along with several other insurers, in a long section titled

---

[7]Again, Peoples's former president, and one of the principal defendants in the underlying suit.

10

"Settling Defendants." The agreement was signed on July 28. On that same day, Berry sent a letter to Tone informing him that the language in the final agreement did not specifically say "CNA." CNA subsequently made its promised payment anonymously through Wright and Burnthorn.

With respect to Hart and Smith, the trial continued. At its conclusion, the jury returned a verdict in favor of the Crowes for $8.5 million. This figure was subsequently trebled in accordance with the statute. Both Hart and Smith appealed that judgment to this court.[8]

During the pendency of that appeal, Joseph R. Ward, Jr., the Crowes' principal attorney throughout the 1992-94 litigation, conducted a judgment debtor examination of Hart. As a result of that examination, Ward discovered the D&O Policy.

## II

On November 15, 1994, the district court received a letter from Ward addressed to eleven of the defense counsel. It stated that he had recently become aware of the D&O Policy, and that he believed there may have been a number of instances where the defense attorneys violated their discovery obligations by not

---

[8]As we shall see, Hart subsequently settled with the Crowes. Smith pressed on with his appeal, however, and on February 26, 1996, this court reversed the verdict and rendered in his favor. Crowe v. Smith, No. 94-41205, 81 F.3d 155 (5th. Cir. 1996) (unpublished).

11

revealing the policy to him.  He gave notice that he was preparing a motion to set aside the settlement and sanction the directors.

After receiving the letter, the court had several ex parte contacts with Ward in an attempt to determine what action should be taken on the matter of the sanctions.  As the court has since repeatedly emphasized, it was in a quandary because neither it nor Ward knew any facts that might substantiate or refute the allegations of misconduct.  Ward subsequently brought his motion, however, and the court then decided that it would conduct an informal meeting with all of the defense attorneys to discuss the situation.  At that meeting, it was decided that a full-fledged trial would be held to resolve the question.  This trial was originally scheduled for September 6.  Based on its conversations with Ward, however, the court had already become convinced at the time of the informal meeting that the directors would likely enter into a renewed settlement with the Crowes, and that sanctions might well be waived therein.  Concerned for its own judicial integrity, the court began to consider bringing an alternate sanctions proceeding itself, on its own motion.  To investigate and, if need be, prosecute that action, the court appointed Ward as attorney for the United States in the matter.  The court made this choice based on Ward's existing familiarity with the case and a lack of viable alternatives.  Ward accepted the appointment, and informed the U.S. Attorney for the Western District of Louisiana of his new status.

Shortly thereafter, the U.S. Attorney's civil and criminal section chiefs paid a visit to the court to discuss the case. The civil chief declined to pursue the matter himself, as he did not consider the sanctions to be civil in nature. The criminal chief indicated that he would be willing to pursue the matter as a criminal case, if the court declared it to be such. The court declined his offer on the grounds that it "did not consider the defendants criminals," and continued its employment of Ward. After reflecting on the meeting, however, the court did change Ward's title, designating him attorney for "the court" instead of "the United States."

On June 10, CNA and its counsel procured a new settlement with the Crowes,[9] who then, as the district court feared, stopped prosecution of their sanctions motion. The court then entered its own motion for sanctions pursuant to its inherent power.[10] Ward dutifully investigated the facts of the settlement negotiations and presented them to the court during a rescheduled bench trial. Based on its conversations with the U.S. Attorney's office, and because it was concerned with the possibility that Ward would be erroneously viewed as a "prosecutor," the court expressly limited

---

[9]For an additional $4 million. In addition to the Crowes' claims against the clients of the attorney sanctions defendants, this settlement also terminated the Crowes' claims against Hart, as he was also covered by the D&O Policy.

[10]As opposed to its power under Fed. R. Civ. P. 11, which is not implicated here.

13

him, at all times, to a role of gathering and presenting the evidence. In particular, the court "kept its own counsel" as to relevant legal theories, the designation of defendants, and the overall appropriateness of sanctions, with the sole exception that the *defendants* were allowed to present briefs on the legal issues. The court did, however, engage in a few additional ex parte contacts with Ward during the investigation period, in an effort to resolve procedural questions relating to his representation and to ensure that the subjects that the court found most relevant were adequately investigated in discovery. It was also the case that Ward testified at the trial in addition to serving as the court's attorney. The defendants, for their part, were at all times represented by counsel, and were able to hear and respond to all the evidence accumulated against them. After extensive discovery and some five days of trial, on July 25, 1996, the court found the conduct of the defendants sanctionable. The court raised multiple theories of liability, but the essential basis for its judgment was the finding that all of the sanctions defendants had willfully conspired to defraud the Crowes by concealing the D&O Policy from them despite having discovery-related, ethical, and other duties to reveal it. Based on this finding, the court ordered the following sanctions: (1) for CNA to pay $5 million to the court; (2) for Tone to pay $75,000 to the court;[11] (3) for Berry to be suspended from

_____

[11]One might wonder what the district court intended to do with this money. It seems that the general plan was to create a fund

14

practice before the Western District of Louisiana for a period of nine months; (4) for Wright, Burns, and Bieck to be suspended from practice before the Western District of Louisiana for a period of three months; and (5) for Fiedler and Burnthorn to be reprimanded. The sanctions defendants appeal this judgment on multiple grounds.

III

We review a district court's imposition of sanctions under its inherent power for abuse of discretion. Dawson v. United States, 68 F.3d 886, 895 (5th. Cir. 1997); Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991). Nonetheless, "the threshold for the use of inherent power sanctions is high." Elliot v. Tilton, 64 F.3d 213, 217 (5th Cir. 1995). The inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." Chambers, 501 U.S. at 42 (quoting NASCO, Inc. v. Calcasieu Television and Radio, Inc., 894 F.2d 696, 702 (5th Cir. 1990)). Perhaps for this reason, we have repeatedly emphasized that, where the inherent power is involved, "'our review is not perfunctory.'" Dawson, 68 F.3d at 896 (quoting Shepherd v. American Broadcasting Companies, 62 F.3d 1469, 1475 (D.C. Cir. 1995)). "As the Supreme Court has explained, '[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint

---

from which the court could pay appointed counsel to prosecute this and other sanctions actions throughout the Western District.

15

and discretion.'" <u>Shepherd</u>, 62 F.3d at 1475 (quoting <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764 (1980)).

IV

The sanctions defendants argue that the district court abused its discretion in two main respects in this case. First, they assert that the court deprived them of their right to due process by imposing criminal sanctions on them via a manifestly civil process. Second, they argue that the court clearly erred in making its required finding of bad faith conduct. We address each contention in turn.

A

The sanctions defendants first argue that the district court deprived them of their right to due process by imposing criminal sanctions in a civil proceeding. In particular, they contend that their due process rights were infringed because the district court appointed Ward to "prosecute" their sanctions. They insist that, because Ward's other clients, the Crowes, were the purported victims of the fraud, and maintained private rights of action for any wrongdoing, he was not a disinterested prosecutor, as required for the prosecution of criminal sanctions. In this regard, they also note that Ward had a personal interest in finding their conduct sanctionable, in the sense that, if the conduct of his former opponents had been found to be unobjectionable, he would have faced potential malpractice liability for his own failure earlier to locate the D&O Policy. In addition to these problems

16

associated with Ward serving as "prosecutor," the sanctions defendants also assert separate due process violations based on the fact that Ward both testified and served as attorney, and the fact that he had ex parte contacts with the court. After lengthy consideration, we find substantial merit in these due process arguments as applied to defendants CNA and Tone, but not as to defendants Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry.

1

As the sanctions defendants correctly point out, and as the Supreme Court has often explained, the initial touchstone for determining the due process rights of a sanctions defendant lies in the characterization of the particular contempt as either "civil" or "criminal":

> Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required. To the extent that such contempts take on a punitive character, however, and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order.

International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 831 (1994); see also Hicks v. Feiock, 485 U.S. 624, 632 (1988) (in a contempt action, as in any other, "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings").

17

As the Supreme Court has also made clear, "conclusions about the civil or criminal nature of a contempt sanction are properly drawn . . . 'from an examination of the character of the relief itself.'"  <u>Bagwell</u>, 512 U.S. at 828 (quoting <u>Hicks</u>, 485 U.S. at 635).  In this case, we are presented with two principal types of "relief": fines payable to the court for CNA and Tone, and suspensions from practice or official reprimands for Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry.  We consider each class of relief in turn.

We begin with the fines imposed on CNA and Tone. With regard to these sanctions, we have little difficulty in finding that they were criminal in character. As the Supreme Court has expressly stated:

> A contempt fine . . . is civil and remedial if it "either coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." Where the fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge. Thus, a "flat, unconditional fine" totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance.

Bagwell, 512 U.S. at 829 (quoting United States v. Mine Workers, 330 U.S. 258, 303-04 (1947), and Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590 (1947), respectively); cf. In re Terrebonne Fuel and Lube, Inc., 108 F.3d 609, 612 (5th Cir. 1997) ("If the purpose of the order is to punish the party whose conduct is in question or to vindicate the authority of the court, the order is viewed as criminal. If, on the other hand, the purpose of the contempt order is to coerce compliance with a court order or to compensate another party for the contemnor's violation, the order is considered to be civil."). Because the fines in this case were payable to the court, they were not compensatory. Because they were also flat fines that did not afford an opportunity to purge, they were criminal in character. To the extent that the district court concluded to the contrary, it was clearly in error.

Having determined that the fines were criminal in character, the question becomes whether the procedures applied by the district court were adequate for criminal contempt. In Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 804 (1987), the Supreme Court held that "[a] private attorney appointed to prosecute a criminal contempt . . . should be as disinterested as a public prosecutor who undertakes such a prosecution." In this case, Ward's concurrent representation of the Crowes, who retained substantial possibilities for private recovery against the defendants, coupled with his own potential malpractice liability for the events at issue, combine to belie any contention that he was "as disinterested as a public prosecutor." There can therefore be no doubt that, at least to the extent that Ward was in fact allowed to serve as "prosecutor," the district court failed to follow the command of Young. Furthermore, the argument that Ward was not actually acting as a prosecutor--in the sense that he only investigated and presented the evidence, leaving to the judge and defendants the entirety of the legal argument--is of no moment in this context. As we have expressly held in the past, where criminal contempt is involved, there must actually *be* an independent prosecutor of some kind, because the district court is not constitutionally competent to fulfill that role on its own. See FDIC v. LeGrand, 43 F.3d 163, 169 & n.6 (5th Cir. 1995); see also Fed. R. Crim. P. 42(b); cf. Young, 481 U.S. at 798-99 (noting other general requirements of criminal procedure in the contempt

20

context, including a presumption of innocence, the beyond-a-reasonable-doubt burden of proof, the right against self-incrimination, the right to notice, the right to be heard, the right to counsel, the right to call witnesses, the right to an unbiased judge, and the right to a jury trial where the contempt is serious). Thus, in whatever way the situation is characterized, the district court would appear to have violated CNA and Tone's right to due process by denying them an independent and impartial prosecutor for the manifestly criminal sanctions that it imposed.

One response to this reasoning might be that the Supreme Court in Bagwell stopped short of saying that the full range of traditional criminal procedural protections is mandated in every criminal contempt proceeding. As noted above, the rule of that case was simply that "criminal procedures *may* be in order," if the imposition of contempt is not "justified by other considerations central to the contempt power." Bagwell, 512 U.S. at 831 (emphasis added). Thus, it might perhaps be argued that the lack of an independent and impartial prosecutor was somehow justified in this case by such "other considerations."

Upon closer inspection, however, this response lacks merit. The Bagwell Court identified only two classes of criminal contempt in which the "other considerations" might indicate a lesser degree of procedural protection. The first is the case of the "direct contempt" committed "in the presence of the court," and the rationale is the quite sensible one that "[t]he necessity

justification for the contempt authority is at its pinnacle . . . where contumacious conduct threatens a court's immediate ability to conduct its proceedings."  <u>Bagwell</u>, 512 U.S. at 832.  The second exception is for "petty" fines, which the district court has been traditionally allowed to impose in a summary manner.  <u>See</u> <u>id.</u> at 837 n.5 & 838-39.  Although our own recent decision in <u>Carroll v. The Jaques Admiralty Law Firm, P.C.</u>, 110 F.3d 290, 293 (5th Cir. 1997) (Jones, J.), would appear to indicate either that a $7000 fine is "petty," or that "direct contempt" includes the disruption of ongoing, out-of-court discovery,[12] nothing in that case or <u>Bagwell</u> can be read as saying that there is any "other consideration" that might justify curtailed criminal procedures for the imposition of $5 million and $75,000[13] fines to punish a months-old discovery violation in a long-settled case.  Indeed, the <u>Bagwell</u> Court was quite clear that for "indirect [criminal] contempts" involving, for example, "out-of-court disobedience to complex injunctions," criminal protections are clearly "necessary and appropriate to protect the due process rights of parties and prevent the arbitrary exercise of judicial power."  <u>Id.</u> at 833-34; <u>cf.</u> <u>Green v. United</u>

---

[12]<u>See also</u> <u>Bagwell</u>, 512 U.S. at 833, with regard to the proper procedure for such ongoing discovery violations.

[13]We need not decide today what the precise limit is for a "petty" fine, because $75,000 is manifestly non-petty in the case of an individual, just as $5 million is non-petty in the case of a corporation.  We note, however, that the <u>Bagwell</u> Court strongly suggested, without deciding, that $5000 was an appropriate limit for individuals, and $10,000 for corporations.  <u>See</u> <u>Bagwell</u>, 512 U.S. at 837 n.5.

<u>States</u>, 356 U.S. 165, 217 n.33 (1958) (Black, J., dissenting) ("Alleged contempts committed beyond the court's presence where the judge has no personal knowledge of the material facts are especially suited for trial by jury. A hearing must be held, witnesses must be called, and evidence taken in any event. And often . . . crucial facts are in close dispute."). For this reason, we see no justification here for a departure from the mandate of <u>Young</u>, and therefore conclude that the district court committed a clear violation of CNA and Tone's right to due process in this case when it imposed determinative criminal fines on them without affording the benefit of an independent and impartial prosecutor.[14] These sanctions must therefore be reversed and vacated.[15]

3

We turn next to the suspensions and reprimands meted out to sanctions defendants Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry. Although these sanctions present a very close question, we are ultimately persuaded by our clear precedents that they are not

---

[14]And, of course, potentially in a number of other respects as well, as the majority of the other standard criminal protections noted by the Court in <u>Young</u>, 481 U.S. at 798-99, were ignored in this case as well.

[15]We note in passing that our judgment on this point accords in both reasoning and result with the Eleventh Circuit's decision in <u>In re E.I. Dupont de Nemours & Co.-Benlate Litigation</u>, 99 F.3d 363 (11th Cir. 1996) (finding the imposition of a $6.8 million determinative fine without benefit of criminal procedural protections to violate due process under <u>Bagwell</u> and <u>Hicks</u>).

so criminal in character as to render the district court's chosen procedures faulty.

We must concede, however, an initial impression that <u>Bagwell</u> appears to mandate the opposite result. In addition to the above-discussed analysis of criminal versus civil character in the fine context, the Court noted in that case that, as a general matter, sanctions that serve to "vindicate the authority of the court" are criminal in character. <u>Bagwell</u>, 512 U.S. at 828; <u>see also</u> <u>Terrebonne</u>, 108 F.3d at 612 ("If the purpose of the order is to punish the party whose conduct is in question or to vindicate the authority of the court, the order is viewed as criminal."). Suspensions and reprimands surely serve to accomplish the goal of vindication, so to that extent they would appear to be criminal in character.

In this case, however, our investigation cannot be limited to so simplistic an analysis. Unlike some of the other likely candidates for use as contempt sanctions, those that address attorney discipline have been squarely placed in a decidedly different and grayer area by both the Supreme Court and our own past decisions. <u>See, e.g.</u>, <u>Cammer v. United States</u>, 350 U.S. 399, 408 n.7 (1956) ("'The power to disbar an attorney proceeds upon very different grounds' from those which support a court's power to punish for contempt.") (quoting <u>Ex Parte Robinson</u>, 86 U.S. (19 Wall.) 505, 512 (1873)); <u>Ex Parte Wall</u>, 107 U.S. 265, 288 (1883) (stating that a disbarment proceeding requires no formal indictment,

24

because it "is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them"); Johnson v. Ayers, 921 F.2d 585, 586 (5th Cir. 1991) (Wisdom, J.) ("'Disbarment proceedings are not for the purpose of punishment, but rather seek to determine the fitness of an official of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice.'") (quoting In re Derryberry, 72 B.R. 874, 881 (Bankr. N.D. Ohio 1987)).  As we recently restated the matter in Dailey v. Vought Aircraft Co., 141 F.3d 224 (5th Cir. 1998), "disbarment is intended to protect the public" in addition to being "a 'punishment or penalty imposed on the lawyer,'" and it is therefore "quasi-criminal in nature."  Id. at 229 (quoting In re Ruffalo, 390 U.S. 544, 550 (1968)).  Although both the Supreme Court and this court have often relied on this "quasi-criminal" characterization to hold that "an attorney is entitled to procedural due process which includes notice and an opportunity to be heard in disbarment proceedings," see, e.g., Dailey, 141 F.3d at 229; Ruffalo, 390 U.S. at 550, we have only rarely gone farther.[16]  Cf. In re Ming, 469 F.2d 1352, 1355 (7th Cir. 1972) ("'All that is requisite to their [disbarment proceedings] validity is that, when not taken for matters occurring

_____

[16]In this case, there is obviously no contention that the district court failed to provide either adequate notice of the sanctions or an opportunity to be heard.

in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence.'") (quoting Randall v. Brigham, 74 U.S. (7 Wall.) 523, 540 (1868)).  Indeed, even in the limited instances where this court has mandated specific additional protections, the manner in which we have done so leaves the unmistakable impression that "quasi-criminal" means "less than criminal" for due process purposes.  See, e.g., In re Thalheim, 853 F.2d 383, 388 n.9 (5th Cir. 1988) (requiring "clear-and-convincing" evidence of a disbarrable offense, rather than proof "beyond a reasonable doubt," as a blind application of full criminal contempt procedure would suggest).[17]  Furthermore, and as noted in Cammer, the imposition of disciplinary sanctions itself implicates an independent and

---

[17]But see Thalheim, 853 F.2d at 388 (also requiring that the court's disciplinary rules be read strictly, resolving any ambiguity in favor of the person charged, in an unexplained but obviously intentional application of criminal law's rule of lenity).  In response to that point, we can only note that the question whether the rule of lenity is even a fundamental requirement of due process in more traditional criminal settings is a question of some complexity.

We should also note that the other major additional procedural protection that we have specifically mandated for disbarment cases--the requirement that the district court strictly abide by such rules of disciplinary enforcement as it has created, see Thalheim, 853 F.2d at 388--is not implicated in this case, because the Western District of Louisiana, unlike the Eastern District, did not have such rules at the time these sanctions were imposed.  Cf. ULLR 83.2.10E (1994).  As such, we need only analyze the procedures actually employed to see if they meet the requirements of due process.  Cf. Ming, 469 F.2d at 1355 ("The district courts are free to adopt their own local rules defining grounds for disbarment and suspension and the procedures to be followed.  But these rules must meet the requirements of due process.").

26

fundamental duty of the district court--the supervision of the attorneys who practice as members of its bar--in ways that other sanctions simply cannot. Cf. RTC v. Bright, 6 F.3d 336, 340 (5th Cir. 1993) ("It is beyond dispute that a federal court may suspend or dismiss an attorney as an exercise of the court's inherent powers."); Howell v. State Bar of Texas, 843 F.2d 205, 206 (5th Cir. 1988) ("Since the early days of English common law, it has been widely recognized that courts possess the inherent power to regulate the conduct of attorneys who practice before them and to discipline or disbar such of those attorneys as are guilty of unprofessional conduct."); Flaksa v. Little River Marine Constr. Co., 389 F.2d 885, 889 n.10 (5th Cir. 1968) ("'The power of a court to discipline members of its own bar can scarcely be doubted seriously. An attorney is under no obligation to seek admission to the bar of a United States district court. He is at liberty to abstain from membership in that or any other bar. But when he does apply and is admitted he secures certain privileges and also assumes definite obligations. The power of a court to impose appropriate and reasonable sanctions upon those admitted to its bar is a familiar phenomenon and lies within the inherent power of any court of record.'") (quoting Gamble v. Pope & Talbert, Inc., 307 F.2d 729, 735 (3d Cir. 1962) (Biggs, CJ., dissenting)); Woodham v. American Cystoscope Co., 335 F.2d 551, 557 (5th Cir. 1964) (referencing Gamble and noting that appropriate "modes of discipline against the attorney might include: (1) a reprimand by the court, (2) a finding

27

of contempt, or (3) a prohibition against practicing for a limited time before the court whose order was neglected or disregarded") (quoting Comment, Sanctions at Pre-Trial Stages, 72 Yale L. J. 819, 830 (1963)); Roadway Express, Inc. v. Piper, 477 U.S. 752, 766 n.12 (1980) (citing Chief Judge Biggs's dissent in Gamble with approval). Thus, whatever might be the implications of the more general statements in Bagwell--and we also note, for the record, that Bagwell did not directly address the status of disbarments or other disciplinary sanctions--in the light of the extensive disciplinary case law we have cited, we are constrained by binding precedent to reject the sanctions defendants' invitation in this case to apply a blunt requirement of full criminal procedure to every disbarment that the district courts of this circuit choose to issue in the exercise of their inherent power. Even more surely, our precedent emphatically dismisses such extensive procedural hoop-jumping for the far less serious disciplinary sanctions of suspension and reprimand. In resolving this case, we must simply remain content to retain the vague, "quasi-criminal" designation that our precedents have expressly chosen to place upon such sanctions, and conduct our due process analysis on that basis.

In so doing, we may rely on the well established propositions that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)), and that "[t]he very

nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation," Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895 (1961). Stated another way, due process, "'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances.'" Mathews, 424 U.S. at 334 (quoting McElroy, 367 U.S. at 895). In each individual case, identification of the specific dictates of due process is "guided by a Mathews v. Eldridge balancing which requires the weighing of the private interests affected by the official action, the risk of erroneous deprivation through the existing procedure, and the government's interest in minimizing its administrative and financial burdens." Metro County Title, Inc. v. FDIC, 13 F.3d 883, 887 (5th Cir. 1994) (citing Mathews, 424 U.S. at 334-35); cf. Santosky v. Kramer, 455 U.S. 745, 753-54 (1982) (applying the Mathews test and requiring only a "fundamentally fair procedure" for the state to terminate the rather weighty rights of parentage); Burnett v. Collins, 982 F.2d 922, 928 n.8 (5th Cir. 1993) (Garwood, J.) (noting that, even in a criminal case where evidentiary errors have occurred, due process requires nothing more than "a fundamentally fair trial"); Link v. Wabash Railroad Co., 370 U.S. 626, 632 (1962) (noting that the "adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct"). Furthermore, it is

well established that, even where the sanction is patently criminal, "[u]nless an action violates a specific provision of the Constitution, the due process clause requires 'only the most basic procedural safeguards.'" Young v. Herring, 938 F.3d 543, 557 n.3 (5th Cir. 1991) (King, J.) (quoting Patterson v. New York, 432 U.S. 197, 210 (1977)).

That said, just which "basic procedural safeguards" will be generally implicated by imposition of the "quasi-criminal" sanction of disbarment is a close and vexatious question. It is not, however, a question that requires a thorough answer at the present juncture, so long as we remain focused, as we surely must, on the specific faults alleged by the sanctions defendants in the instant case: First, Ward's service as "prosecutor"; second, the fact that he testified in addition to serving as attorney; and third, his ex parte contacts with the court. We address each in turn.

a

With regard to Ward's service as prosecutor, our decision in NASCO, Inc. v. Calcasieu Television and Radio, Inc., 894 F.2d 696 (5th Cir. 1990) (Higginbotham, J.), is largely dispositive of the issue. In that case, the district court imposed, among other things, a compensatory civil sanction of attorney's fees and expenses, and a "quasi-criminal" sanction of a three-year disbarment, against G. Russell Chambers, the owner of Calcasieu Television, and A. J. Gray, his chief attorney, in response to a "long and arduous campaign of fraud, deceit, delay, harassment,

30

oppression and expense" in Calcasieu's litigation of a contract claim brought against it by NASCO. See NASCO, Inc. v. Calcasieu Television and Radio, Inc., 124 F.R.D. 120, 143-45 (W.D. La. 1989). The motion for monetary sanctions had been brought by NASCO, and it was resolved by way of a one-day bench trial in which each side was allowed to present evidence and argue the merits of its position. Gray's disbarment, on the other hand, was brought by the court, and legal argument on the issue was limited to the court's own research and such briefs as the parties chose to submit after the hearing on the monetary sanctions.[18] In response to Gray's argument on appeal that he had been deprived of his right to due process, and in particular of his right to a disinterested prosecutor for the "criminal" sanction of disbarment, we stated:

> [W]e are not persuaded that NASCO's "prosecution" of the sanctions proceeding violated the strictures of Young v. United States, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d

---

[18]As the district court itself described the procedure:

. . . We finally decided that NASCO's counsel would certainly make application for sanctions in the form of attorney's fees and expenses. The Court would rely on that application and the oppositions filed by defendants for investigation and the appropriateness of that kind of sanction. The Court would rely on its own research and any additional research that we might request of the parties regarding the imposition of other types of sanctions. On appeal, NASCO's counsel is to defend the entire judgment of this Court, including sanctions other than attorney's fees and expenses. If sanctions are found and become final, they shall include the attorney's fees and expenses of NASCO's counsel in representing NASCO and the public in the sanction phase of this suit.

NASCO, 124 F.R.D. at 137.

31

740 (1987). There the Court held the appointment of the opposing counsel in the underlying litigation to prosecute a criminal contempt proceeding violated due process. The Court reasoned that counsel could not adequately represent the interests of the government and the interests of his private client at the same time. 107 S.Ct. at 2135-2139. Gray argues that because we have characterized a disbarment proceeding as quasi-criminal, In re Thalheim, 853 F.2d 383, 388 (5th Cir. 1988), the reasoning in Young should apply. We are unable to find any authority to support Gray's contentions and he points us to none. Further, we conclude that the danger present in Young, that private counsel would be overzealous in the contempt proceedings in an effort to further the interest of his client, was not present here. The arguments of counsel at the hearing were devoted entirely to the issue of monetary sanctions. The court later relied on its own research, aided by any briefs the parties wished to file, in determining the propriety of nonmonetary sanctions. 124 F.R.D. at 137, n.10. The court thus avoided placing NASCO's counsel in the role of prosecutor for the disbarment proceedings.

NASCO, 894 F.2d 707-08.

We read NASCO as standing for the proposition that Young is not infringed, even where the district court relies on interested opposing counsel to present the facts[19] giving rise to an imposition

---

[19]Although Judge Higginbotham's description might leave some room for ambiguity, in point of fact there can be no doubt that the district court in NASCO relied primarily on the extensive factual development of the monetary sanctions proceeding in finding Gray disbarrable. As the following excerpt of its findings makes clear, the court disbarred Gray on the basis of a wide variety of actions and culpable mental states derived from the whole course of Chambers's scheme, including much out-of-court plotting and other activity that the court could not possibly have known about save for the trial:

> . . . In his conduct in this case, Gray has actively violated almost every one of [his] ethical and professional responsibilities. He accepted and tried a case for the explicit purpose of doing injustice, i.e., he used every means at his disposal to defeat a perfectly legal and enforceable purchase contract against which he

32

of the quasi-criminal sanction of disbarment, so long as the court relies on its own research (as supplemented by appropriate briefing by the parties) with regard to relevant legal issues and the overall appropriateness of disbarment. The logic would appear to be that, by avoiding putting opposing counsel in the position of making legal argument in favor of disbarment, the court sufficiently avoids

> well knew his client had no defenses. He misused the injunction notice given by NASCO. He devised a fraudulent and illegal scheme to deprive this Court of the jurisdiction which it had at the time NASCO's notice was delivered on Friday, October 14, 1983. The sale to the Trust as attempted was an absolute simulation and totally void and incomplete at the time it was recorded. It was recorded in haste for the purpose of rendering the impending injunction ineffective. He not only failed to disclose essential and pertinent facts, he actively misled the Court and recorded his conversation with the Court without disclosing to the Court his intent to do so. By these actions the Court was forced to delay action on the merits until it was determined by trial that the Court again had jurisdiction. During this delay Gray utilized his legal skills and experience to lead, on behalf of Chambers, a campaign of harassment, oppression and delay sufficient to force NASCO to spend over a million dollars in attorney's fees and expenses to defend its rights to the performance of a perfectly legal and enforceable contract. More amazing, this was accomplished without the introduction by defendants of one single item of evidence against the validity of the Purchase Agreement. This case is unique. The manner in which it was conducted by Gray is a disgrace to the legal profession. It is our reluctant duty as a sanction to disbar Gray from practice as an attorney in the Western District of Louisiana . . .

NASCO, 124 F.R.D. at 144-45. In this regard, it might also be noted that the above description of Gray's conduct was part and parcel of the court's unified and consistent description of Chambers's entire "campaign," which surely would not have been the case had Gray been afforded the benefit of factual development independent of the monetary sanctions proceeding.

placing him in the role of prosecutor so as to escape the mandate of <u>Young</u>.[20]  Whatever we might think of this reasoning as a de novo matter, we are of course bound by our prior circuit precedent and must accept <u>NASCO</u>'s rule in this case.  See <u>Hoque v. Johnson</u>, 131 F.3d 466, 491 (5th Cir. 1997) (Garwood, J.) ("One panel of this Court may not overrule another (absent an intervening decision to the contrary by the Supreme Court or the en banc court . . .).").  Furthermore, were we to consider the question afresh, we would note that the "compromise" nature of the <u>NASCO</u> rule seems to us to be highly consistent with other aspects of the murky "quasi-ness" of disbarment's criminal character, including particularly the use of a "clear-and-convincing" (as opposed to "beyond-a-reasonable-doubt") burden of proof, and the fact that the normal criminal requirement that there actually *be* a separate prosecutor does not appear to apply in the disciplinary context.

In applying the <u>NASCO</u> rule to this case, our review of the record casts no doubt on the district court's express assurance that, in order to "'preserve the court's independent thought,' Ward was restricted to a statement of the facts."  He "conducted investigations, took depositions, collected other evidence, and cross-examined witnesses," but he "was not allowed to present argument, submit legal authorities after trial, or suggest the

_____

[20]<u>Young</u> does not, of course, apply to civil sanctions proceedings.  See, e.g., <u>Portland Feminist Women's Health Center v. Advocates for Life, Inc.</u>, 877 F.2d 787, 790 (9th Cir. 1989).

34

sanctions to be imposed." On those matters, as well as on the selection of the particular defendants to be charged, the court "kept its own counsel." With the exception of the issues of attorney testimony and ex parte contacts discussed separately below, we can find no serious deviation[21] from the procedure expressly approved in NASCO,[22] and therefore conclude that the employment of Ward as "prosecutor" did not violate the remaining sanctions defendants' right to due process.

b

We turn next to the question of attorney testimony. On this point, we are confronted with less precedent, but an arguably clearer answer. Although Rule 3.7 of the Louisiana Rules of Professional Conduct (applicable to attorneys practicing before the Western District, see ULLR 83.2.4W (1994)) is clear that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness" (with exceptions not applicable here), local ethical rules are "not the 'sole' authority governing motions to disqualify counsel." FDIC v. United States Fire Ins. Co., 50 F.3d 1304, 1312 (5th Cir. 1995). Federal courts decide such motions on the basis of federal, not state, law, and "'consider the motion

---

[21]Indeed, to the extent that Ward, unlike NASCO's attorneys, was not arguing a live sanctions motion of his own while presenting the evidence forming the basis for disbarment, this case arguably presents a far less problematic scenario.

[22]A fact that is not in the least surprising, given that Judge Scott was the very district judge whose procedures we affirmed in NASCO.

35

governed by the ethical rules announced by the national profession in the light of the public interest and the litigant's rights.'" Id. (quoting In re Dresser Indus., 972 F.2d 540, 543 (5th Cir. 1992)). Although local ethical rules are certainly relevant to that analysis, they are not dispositive.

Furthermore, and as numerous courts and commentators have recognized, the only justification for the attorney testimony rule that might be viewed as affecting the rights of the opposing party is that derived from the fear that the jury will either accord such testimony undue weight, or will be unable to distinguish between the attorney's testimony, offered under oath, and his legal argument, offered in rhetorical support of his client's case. See, e.g., Dawson v. Orkin Exterminating Co., 736 F.Supp. 1049, 1054 (D. Col. 1990) (noting that the rule "is designed primarily to preclude the unseemly situation in which the lawyer must argue his own credibility before the jury"); In re Whitney-Forbes, Inc., 31 B.R. 836, 842 (Bankr. N.D. Ill. 1983) ("The principal danger which results from having active participation by an attorney who will be a witness is that a jury will accord a disproportionate weight to his testimony."); People v. Superior Court of San Luis Obispo County, 84 Cal. App. 3d 491, 501 (Cal. Ct. App. 1978) (noting that "the reluctance of courts to allow such testimony . . . is the danger that a jury would believe the . . . attorney to be more credible than an ordinary witness"); Greenebaum-Mountain Mortgage Co. v. Pioneer National Title Ins. Co., 421 F.Supp. 1348, 1354 (D.

Col. 1976) (citing the "fear that the statements of counsel in closing arguments might bear too much weight with the jury, since the jury previously observed the attorney taking an oath to tell only the truth"); cf. United States Fire Ins. Co., 50 F.3d at 1311 (generally noting the reasons for the rule); 6 Wigmore on Evidence § 1911 (1940 ed.) (same). As the majority of these courts have also recognized, this justification is inapplicable where, as here, the testimony is made to a judge, not a jury. See Orkin, 736 F.Supp. at 1054 ("Here, . . . counsel testified in a hearing before [a judge] . . . . The rule is therefore inapplicable."); Whitney-Forbes, 31 B.R. at 842 ("That problem does not exist in a bench trial."); Superior Court, 84 Cal. App. 3d at 501-02 (noting that "where the . . . attorney will only be testifying at pretrial hearings where the trier of fact is a judge, not a jury, th[e] danger does not exist"); Greenebaum-Mountain Mortgage Co., 421 F.Supp. at 1354 ("Because this case involves a trial to the court, rather than to a jury, we are confident that the finder of fact can make the necessary distinctions.").

In the light of this wide swath of opinion on this particular rule of the "national profession," and in the light of the additional fact that the attorney testimony rule has been held to be completely inapplicable to attorney pro se litigants, see Duncan v. Poythress, 777 F.2d 1508, 1515 n.21 (11th Cir. 1985) (also noting, consistent with the above cases, that, because "a judge was the trier of fact, . . . there was no danger that the trier of fact

could not distinguish between testimony and advocacy"), we find no merit to the contention that allowing Ward to testify at the bench trial in this case could have infringed the remaining defendants' right to due process.[23]

                                    c

We come, then, to the final alleged procedural defect: Ward's ex parte contacts with the court.  After extensive research, we could locate no Fifth Circuit case that found ex parte "contacts" to constitute a reversible violation of due process.  What we did find were a vast number of cases holding the contrary--often in far

_____

[23]We also note that, as a practical matter, such testimony will often be necessary.  One of the primary justifications for allowing opposing counsel to present evidence in these cases is the fact that he will already be familiar with the underlying events, having taken part in the proceedings in which the allegedly improper conduct by his opponent occurred.  In these circumstances, it is an almost foregone conclusion that counsel will also have relevant evidence of those proceedings.  If we are to abide by NASCO and allow the district court a workable way to investigate these matters, we must accept the admittedly unusual fact of attorney testimony as part of the bargain.

more serious criminal and deportation contexts.[24]  Other courts

treat such claims similarly.[25]

---

[24]See, e.g., Herring, 938 F.2d at 557 (King, J.) ("Because the ex parte instruction in the instant case does not implicate a specific constitutional provision, [the defendant] must demonstrate that, based on all the circumstances, the instruction prevented him from receiving a fair and just hearing.") (citing United States v. Widgery, 778 F.2d 325, 330 (7th Cir. 1985)); United States v. Patterson, 809 F.2d 244, 248 (5th Cir. 1987) ("The defendants argue that the district court's ex parte, in camera procedure violated their rights under the confrontation and due process clauses . . . .  We need not consider these claims because any possible errors made by the district court in connection with its ex parte, in camera inquiry would be harmless."); Vardas v. Estelle, 715 F.2d 206, 208 (5th Cir. 1983) ("The district court in denying habeas corpus in this case determined that the ex parte procedure followed here violated state procedures, but was not in violation of constitutional due process.  A state court's failure to follow its own procedural rules does not of itself raise a federal constitutional question cognizable in habeas corpus."); In re Eisenberg, 654 F.2d 1107, 1112 (5th Cir. Unit B Sept. 4, 1981) (finding no due process violation for ex parte hearings on discovery questions); Chan v. INS, 634 F.2d 248, 258 (5th Cir. Jan. 15, 1981) ("[The deportee] argues that the immigration judge, at the time of his motion to reopen, violated due process when he engaged in ex parte communications with a deportation officer . . . .  Chan has failed to make any allegation that the alleged ex parte communications between the immigration judge and the deportation officer at the time of the motion to reopen prejudiced the merits of his case.  Therefore, he may not claim that his due process rights were violated.").

[25]See, e.g., United States v. Lutz, No. 95-17040, 103 F.3d 142, 1996 WL 711435 (9th Cir. 1996) (unpublished) ("[The defendant] contends that his due process rights were violated in the course of this section 2255 motion because the district court . . . allowed [the government] to file ex parte motions . . . . [T]he district court did not exceed its authority when it . . . allowed the government to file ex parte motions."); In re Grand Jury Subpoena, 72 F.3d 271, 276-77 (2d Cir. 1995) (stating, in the context of discussing whether the failure to provide a witness with ex parte material submitted by the government and reviewed in camera by the court violated that witness's due process rights in a subsequent proceeding to hold him in contempt for refusing to testify, that "while this procedure does not occur frequently, it is not forbidden when justified"); In re Grand Jury Witness, 835 F.2d 437,

Based on this rather extensive tradition of affording little or no weight to isolated ex parte contacts, and in the light of the fact that our review of the record reveals the contacts in this case to have been limited to the most de minimis and harmless procedural matters (such as ascertaining whether Ward would indeed prosecute a sanctions motion on the Crowes' behalf, so the court could decide whether it need even *consider* bringing its own motion, and directing that discovery be conducted in certain areas that the court had itself determined to be particularly relevant), we find no merit to the contention that the ex parte contacts rendered the proceeding "fundamentally unfair" such as to violate the remaining defendants' right to due process.

d

---

441 (2d Cir. 1987) ("Appellant next asserts that during the contempt hearing the government presented the district court with a sealed ex parte affidavit, and adjourned to the robing room to discuss it outside the presence of . . . counsel, . . . [and] that this submission . . . denied him his right to a fair hearing. . . . [T]he procedures followed by the district court in adjudicating appellant in civil contempt did not deprive him either of due process of the law or of a fair hearing."); Fitzgerald v. Kingston, 1998 WL 372763, *5 (D. Mass. 1998) ("[The defendant] alleges that the . . . the ex parte receipt of the additional . . . information . . . violated his procedural due process . . . rights. . . . [W]hile the ex parte receipt of additional information on the subject of the suspension was culpable (even the Town's counsel conceded at oral argument that the omission was not good practice), it did not rise to a constitutional level. Full judicial-type hearings are not required when local boards engage in granting or revoking permits, [even] in cases, such as this, of the *revocation of a professional or occupational license*.") (quotations and citations omitted) (emphasis added).

Having concluded that the remaining defendants' due process rights were not themselves violated by the district court's procedures, the only potential question remaining is whether the violation of CNA and Tone's rights somehow "tainted" the proceeding, such that the remaining defendants are also entitled to a reversal of their sanctions.  It has been argued in this regard that our due process ruling must be made on the proceeding as a whole, and not as to individual defendants.

In LeGrand, we were confronted with the far more serious question of a single defendant who was subjected to both criminal and civil contempt sanctions.  We stated:

> The contempt order in this case involves a true mixture of both criminal and civil relief.  Accordingly, it should be characterized as criminal for purposes of appeal.  This characterization permits the review of civil contempt orders which would otherwise not be final and appealable.  However, it does not necessarily follow that, even if this is a true "mixed relief" case, a Court must vacate and remand the whole proceeding for failure to comply with criminal procedure.  In Lamar[ Financial Corp. v. Adams, 918 F.2d 564, 567 (5th Cir. 1990)], the reviewing court vacated and remanded the criminal portion of the order but affirmed the civil portion after finding the district court had not abused its discretion in granting the civil relief.

LeGrand, 43 F.3d at 169-70.  In the light of this precedent, we are confident that we have followed the correct path by making an individual evaluation of each defendant's right to due process, and conclude that our analysis of CNA and Tone's procedural claims is

41

irrelevant to the outcome for the other defendants.[26]  Because we have found the procedure individually sufficient as to defendants Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry, we therefore decline to reverse their sanctions for want of due process, and proceed to their other arguments.

B

Turning, at very long last, to the substance of this case, the sanctions defendants next argue that the district court clearly erred in making its required finding of bad faith conduct.  With regard to sanctions defendants Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry, we must obviously consider this argument, as we have found no procedural basis for a reversal of those defendants' sanctions.  We also consider this merits question as to defendants CNA and Tone, however, because it allows us to determine whether the proceeding can be dismissed as to them, thereby avoiding the potentially vexatious double jeopardy concerns that would be raised by a remand in the light of the criminal nature of their sanctions.

1

---

[26]Obviously, in any sanctions proceeding involving both criminal and civil (or, as here, quasi-criminal) defendants, the proper procedure is to provide full criminal safeguards throughout. We merely note that a lack of proper criminal procedure in a mixed proceeding does not constitute reversible error as to the civil defendants.  As to those defendants, there is simply no entitlement to heightened procedure, and therefore no prejudice in its deprivation.

As noted above, "the threshold for the use of inherent power sanctions is high." Elliot, 64 F.3d at 217. "In order to impose sanctions against [a defendant] under its inherent power, a court must make a specific finding that the [defendant] acted in 'bad faith.'" Chaves v. M/V Medina Star, 47 F.3d 153, 156 (5th Cir. 1995). Where the sanction is disbarment, we have required that this finding be based on "clear-and-convincing" evidence. See In re Medrano, 956 F.2d 101, 102 (5th Cir. 1992). We have also noted that, where the finding of bad faith is based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence," the imposition of sanctions is "'necessarily [an] abuse [of] discretion.'" Dawson, 68 F.3d at 896 (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990)).

In this case, we note at the outset that the district court did make a facially sufficient finding when it ruled that all of the sanctions defendants had engaged in a conspiracy to willfully defraud the Crowes by concealing the D&O Policy from them. The sole question for this court is whether that finding was based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence."

As indicated in Dawson, when sanctions are imposed under the inherent power, our investigation of legal and evidentiary sufficiency is particularly probing. The hand of the district court, as we are reminded by the Supreme Court, is sometimes wont to be imperial, and when the district court dips into its reservoir

43

of inherent power, the attorneys practicing at its bar are likely to be in their most vulnerable setting. Because direct democratic controls are not available to guard against the inherent power of individual judges, we must, on appeal, assure that this power is exercised in the most careful manner. This means that we will probe the record in detail to get at the underlying facts and ensure the legal sufficiency of their support for the district court's more generalized finding of "bad faith."

2

The basis for the district court's finding of bad faith in this case was an attempt to defraud. There were two distinct classes of conduct cited by the court in support of this theory. First, and primarily, the district court found that all of the sanctions defendants willfully failed to disclose the D&O Policy to the Crowes despite having a known duty to reveal it. Second, the district court found that some of the attorney defendants engaged in affirmative misrepresentations or near misrepresentations in an attempt to keep the policy a secret. Clearly, either of these grounds would be sufficient to support a finding of bad faith conduct. The question is whether the record is sufficient to support them.

With respect to the first asserted ground, there is no particular dispute that the sanctions defendants failed to disclose the D&O Policy. Less clear, however, is the extent to which this omission constituted a willful breach of some known duty to act.

44

In its opinion, the district court theorized two principal duties: First, a general duty to reveal applicable insurance policies prior to settlement;[27] second, a more specific duty to respond accurately to discovery requests.[28] At oral argument, however, Ward conceded that the sanctions in this case could only be premised on the duty to respond accurately to discovery requests, either as directly implicated or under a theory of aiding and abetting.[29] For this

---

[27]Based on the somewhat trailblazing case of <u>Spaulding v. Zimmerman</u>, 116 N.W.2d 704 (Minn. 1962), and its dubious progeny. In <u>Spaulding</u>, the court held that a defendant had a duty to reveal his greater knowledge of the extent of a plaintiff's injuries in the context of a settlement requiring court approval. <u>Id.</u> at 709.

[28]A duty that should need no further clarification. Rule 3.3(a)(2) of the Louisiana Rules of Professional Conduct expressly provides that "[a] lawyer shall not knowingly . . . fail to disclose that which he is required by law to reveal," and we have expressly held that inherent power sanctions are an appropriate response to discovery violations. <u>See</u> <u>Carroll</u>, 110 F.3d at 293 (noting that "intentional disruption of the discovery process [is] misconduct that is recognized in the rules, in common sense, and in respect for the court's processes")

[29]The Court:     The problem, to me, is, uh . . . like in negotiations, just as a general proposition, no lawyer is obligated to tell everything that he has before he puts it on the table.

Mr. Ward:     Absolutely.  That's right.

The Court:     So, I mean, here, uh . . . let's just assume that there was no proper interrogatory, or no proper request for production, it seems to me there would have been no obligation for the lawyers to reveal the existence of the CNA policy.  Do you agree with that?

Mr. Ward:     I agree with you 100 percent, Judge.  That's true.  I think there would be an argument--

The Court:     So then only if each of these defendants

45

reason, we will constrain our analysis of the failure-to-disclose prong to this theory of duty.[30]  Under this theory, the question becomes whether the record supports a finding that the sanctions defendants either knowingly made a false response to a discovery request, or knowingly assisted someone else in making or concealing a false response.  After a thorough review of the record, we have determined that it is completely insufficient on this point as to all of the sanctions defendants except Berry.

---

<blockquote>
violated some . . . some *discovery* rule, would they be subject to the sanctions of the court.

Mr. Ward:    I think the discovery devices gave rise to the initial duty.  But this is the problem you have, is when you move over to settlement, these gentlemen and their clients become *aware* that certain parties had a duty to disclose something.  And we get into the problem of an in glo . . . an in globo settlement.  All the defendants know, the record's very . . . very clear; every defendant *knows* that I have asked questions in discovery that give rise to duties to disclose.  So, what . . . what duty do you have when you know someone's perpetrating a fraud, and you assist, or you're going to achieve a benefit from it?
</blockquote>

[30]As a general matter, we will not consider arguments that have not been urged by the parties on appeal.  United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 n.3 (5th Cir. 1998).  We note in passing, however, that, were we not so constrained, we, like Ward, would nonetheless find it difficult to identify any non-discovery-related duty that required the sanctions defendants to reveal all applicable insurance policies to opposing counsel in this case.  Spaulding was an unusual case with a narrow range of factual applicability, and its rather extreme (when more broadly applied) rule finds no support in the jurisprudence of this circuit.

With respect to the second asserted ground, affirmative misrepresentations, the dispute is less complex. Rules 4.1(a) and 8.4(c) of the Louisiana Rules[31] are quite clear in their mandate that attorneys not lie in the course of representation. The question simply becomes whether the record supports a finding that any of the attorney defendants actually lied with respect to the D&O Policy. After a thorough review of the record, we have determined that it is also at least partially insufficient on this point as to all of the sanctions defendants except Berry.

a

With respect to CNA, Tone, Fiedler, and Burnthorn, there was no finding or evidence[32] of any incorrect answer to any discovery

_____

[31]And parallel provisions of every other professional responsibility code, for that matter. See, for example, Rules 4.1 and 8.4 of the ABA's Model Rules of Professional Responsibility.

[32]With respect to Burnthorn, we should note that there was initially some evidence of discovery abuse. In making her client Dollar's claim of privilege in response to Request 5, Burnthorn identified the privileged material (as required by Fed. R. Civ. P. 26(b)(5)) as notifications of claim sent to New England Insurance Company and Home Insurance Company only. Yet barely a week before, Burnthorn had herself drafted a notification of claim to be sent to CNA as well. The failure to identify this notice would appear to be an error so conspicuous that a reasonable trier of fact may have been justified in concluding that Burnthorn (and, through her, Wright) had made a willful omission.

As noted, however, the district court made no such finding, even though it was clearly aware of the nature of the response. Indeed, the district court expressly disclaimed any reliance on alleged discovery violations as a basis for finding bad faith conduct on the part of Wright and Burnthorn, and in assessing sanctions against them, the court relied exclusively on a breach of the now abandoned Spaulding duty. In the light of this treatment, we conclude that the cited evidence was essentially discredited, and we therefore decline to consider it for purposes of this

request at all, much less a willfully false response.  Furthermore, there was no finding or evidence that any of these defendants willfully aided anyone else in making or concealing an incorrect response, or even that they knew that anyone had made an incorrect response.  Finally, there was no finding or evidence that Tone, Fiedler, or Burnthorn ever engaged in any affirmative misrepresentations with respect to the D&O Policy.  As to CNA, Tone, Fiedler, and Burnthorn, the district court's finding of bad faith conduct was therefore clearly in error and its imposition of sanctions an abuse of discretion.

b

With respect to Burns, Bieck, and Wright, there was also no finding or clearly convincing evidence of any incorrect response[33] to a discovery request, or of any knowing assistance[34] of an incorrect response.[35]  There was, however, an implicit finding of

---

appeal.

[33]With regard to Wright, see the discussion of Burnthorn's discovery responses in the preceding note.

[34]The closest that these defendants came to willful aiding and abetting was the meeting on July 26.  At that meeting, it became clear that all three were concerned about the possibility that Berry's discovery responses were inaccurate.  Although the evidence was clear that none of these defendants exercised an appropriate amount of care in investigating this possibility, neither did they knowingly assist Berry in perpetrating a fraud.

[35]There was a finding of bad faith failure to disclose under the now abandoned Spaulding theory of duty.  As the Spaulding duty is no longer a viable one for purposes of this case, we disregard this finding.

48

misrepresentation. The district court held that Burns made a willfully misleading statement at the July 11 meeting when he declared a settlement proposal of $6.2 million to be far beyond any theory of insurance coverage. Furthermore, the court held that Bieck and Wright maintained a knowing silence during this statement.

The record supports the district court's characterization of events, and we are unable to say that the court was clearly in error in declaring the facts of the July 11 meeting, even under the heightened clear-and-convincing evidentiary standard applicable to the sanction of disbarment. Whether the actions of Burns, Bieck, and Wright constituted misrepresentation for purposes of the Louisiana Rules is a better question, but one which we need not reach at this juncture.

For regardless of this "misrepresentation," the district court purported to base its finding of bad faith conduct exclusively on a breach of the duty to reveal the D&O Policy. As we just clarified, however, there was no proper foundation for a finding that these defendants breached a known duty to disclose, as the district court made no finding that these defendants ever made or assisted a false discovery response. As to these three defendants as well, the district court's finding of bad faith conduct was therefore clearly in error.

c

Berry presents a different case. The district court specifically found that he knowingly and deliberately made blatantly

49

incorrect discovery responses to Requests 5 and 8. Berry does not seriously dispute that his responses were in fact false, and, with respect to at least one of them,[36] the record clearly supports the district court's inference that he knew his answer to be incorrect at the time it was offered. Furthermore, the district court also found that Berry attempted to cover up his lapse with outright deception when he repeatedly assured the Crowes' counsel that his clients would be paying for any settlement out of their own pockets. This finding, too, has adequate support in the record. In the light of these specific findings, we cannot say that the district court clearly erred in concluding that Berry engaged in bad faith conduct, or that the evidence was not sufficient to overcome the clear-and-convincing hurdle.

We are not swayed from this view by the fact that there may have been other explanations for Berry's actions. Berry argues, for instance, that he did not disclose the D&O Policy or the past claims correspondence because he simply did not realize that there was a possibility that the policy would actually cover his clients. He essentially pleads incompetence in this respect, stemming from his lack of experience with insurance law. This explanation is supported in some respects by the district court's finding that Berry once actually mentioned the D&O Policy to the Crowes' counsel, referring to it as "lapsed." It is soundly contradicted, however,

---

[36]The response sent on behalf of his fourth director client.

50

by the fact that Berry sought defense and indemnification for his clients under the policy simultaneous with his purported conclusion that it did not cover them.

Even if we were content to characterize Berry as a mere bungler in a de novo review, we would not have that authority in this case. Even under the more than perfunctory review applicable to inherent power sanctions proceedings, the factual findings of the district court are entitled to respect unless clearly erroneous. Berry's purported interpretation of his discovery duties was neither proper nor even rationally consistent. It was not for him to decide, sub silencio, which documents facially covered by a discovery request would be important, and we are certain that no competent attorney would make this presumption. The district court found Berry's explanation to be inherently incredible, and we cannot say that this finding was clearly wrong. We therefore conclude that the district court did not clearly err in finding bad faith conduct on the part of James W. Berry.

d

Because the district court clearly erred in making its required finding of bad faith conduct on the part of defendants Fiedler and Burnthorn, we must reverse and vacate the imposition of sanctions against those defendants. Furthermore, because the record before us indicates no possible evidentiary basis for a proper finding of bad faith conduct on the part of either those defendants or CNA and Tone, we will dismiss the sanctions proceeding as to them. Because

51

we find no clear error with regard to the finding of bad faith conduct on the part of Berry, we will not disturb his sanctions for lack of evidentiary sufficiency.

Burns, Bieck, and Wright present a more intriguing question. As it stands, the district court's finding of bad faith conduct on their part was clearly in error because its assigned basis finds no specific support in the record. As noted above, the district court found that Burns, Bieck, and Wright acted in bad faith because they breached a duty to disclose the D&O Policy. Yet the record reveals that there was no breach of the only relevant duty. The record also indicates, however, that there was a supportable finding of other conduct that would constitute bad faith, in the form of the misrepresentation offered at the July 11 meeting. Because this purported misrepresentation, which we do not take lightly, could be a sufficient independent basis for the imposition of sanctions,[37] we must ask whether it would be proper for this court simply to affirm the sanctions imposed against these defendants under this alternate theory. Because the district court's discretionary decision to sanction these defendants was irreparably intertwined with the

_____

[37]We also note, in this regard, the rather fine distinction between the evidence of Burns, Bieck, and Wright's "misrepresentation," which we consider, and the evidence of Wright and Burnthorn's discovery abuse, which we do not. As discussed above, the district court expressly disclaimed any reliance on Burnthorn's discovery responses as a basis for sanctions, which we read as a rejection of the evidence on that point. The misrepresentation evidence, on the other hand, was never rejected by the district court, and impresses us as having figured prominently in the background of its decision.

52

breach-of-duty theory of fraud,[38] we have concluded that we may not simply affirm it based on another arguably sufficient theory.

The imposition of sanctions under the inherent power is a decision particularly committed to the sound discretion of the district court. The inherent power was expressly derived from that "'control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Chambers, 501 U.S. at 43 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-631 (1962)). When a district court imposes sanctions under the inherent power, it is because the court has determined, in its discretion, that the particular sanctions are necessary to effectuate these important goals as to the particular defendants under its particular theory of the case. For this court to affirm inherent power sanctions on grounds other than those expressly chosen by the imposing court would constitute an encroachment upon that court's discretion unwarranted by the concerns for order and necessity inherent in their use. The district court in this case imposed sanctions for breach of a duty to disclose, and we have now clarified that this basis is insufficient as to these defendants, although another basis, misrepresentation, might be. In this situation, we believe the better course is to reverse and vacate the district court's original imposition of sanctions, and, in the

---

[38]And the now abandoned Spaulding theory of duty.

absence of any other error, remand for reconsideration in the light of our clarification.[39]

---

[39]We may also dispense, at this juncture, with the additional miscellaneous arguments of Burns, Bieck, Wright, and Berry. First, all of these remaining defendants make several unclear and undeveloped arguments regarding improper bias in the district court. They can point us towards no motive for or evidence of expressed partiality, however, and we can see no indication that the district court was either more or less biased than is natural and unavoidable where inherent power sanctions are involved. The mere fact that the court sees fit to bring a sanctions motion will not give rise to an inference of improper bias. See Lemaster v. United States, 891 F.2d 115, 120-21 (6th Cir. 1989).

Second, Berry argues that his sanction was unnecessarily severe. We think it clear, however, that the particular amount of an inherent power sanction is uniquely committed to the sound discretion of the imposing court. In this case, we are content that the district court adequately considered all of the relevant circumstances, and that Berry's sanction was appropriate thereunder. Lest there be any doubt on this point, those circumstances, again, were a deliberate deception leading to a $5 million potential loss. We cannot say that a nine-month suspension from practice was not the least severe sanction necessary to deter such conduct in the future. See Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 86 F.3d 464, 467 (5th Cir. 1996) (noting that the "sanction chosen must employ 'the least possible power adequate to the end proposed'") (quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231 (1821)).

V

For the foregoing reasons, we hold that the district court violated CNA and Tone's right to due process by imposing serious criminal fines on them via a civil process. We find no procedural fault as regards the "quasi-criminal" suspension and reprimand sanctions meted out to the other sanctions defendants. We also hold, however, that the district court's required finding of bad faith conduct was clearly in error as to all of the sanctions defendants save Berry. We therefore REVERSE and VACATE the district court's imposition of sanctions against all of these defendants. Furthermore, because the evidence is completely insufficient to support the sanctions imposed against defendants CNA, Tone, Fiedler, and Burnthorn, we DISMISS the sanctions proceeding as to them. With respect to defendants Burns, Bieck, and Wright, we find the record potentially sufficient to support sanctions, and REMAND to the district court for further consideration in the light of our opinion.[40] We AFFIRM the sanctions imposed against Berry.

Accordingly, the judgment of the district court is REVERSED and RENDERED as to sanctions defendants American Casualty Company of Reading, Pennsylvania, Michael P. Tone, Anne Fiedler, and Judy L.

---

[40]In reaching its decision, the district court should address specifically the manner in which the actions of Burns, and, more importantly, Bieck and Wright, can be equated to a misrepresentation for purposes of the Louisiana Rules. In so doing, the court should pay particular attention to our command in Thalheim that such rules are to be read strictly, resolving all ambiguities in favor of the attorney. See id., 853 F.2d at 388.

Burnthorn.  Judgment is REVERSED and REMANDED as to defendants W.

Glenn Burns, Robert B. Bieck, Jr., and William E. Wright.  Judgment

is AFFIRMED as to defendant James W. Berry.[41]

REVERSED in part, AFFIRMED in part, and
REMANDED with instructions.

ENDRECORD

---

[41]With regard to Judge Scott's outstanding motion for leave to
file an amended judgment, we have determined that it has no bearing
on the issues or outcome of this appeal.  The motion is therefore
DENIED AS MOOT.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

The district court below not only appointed plaintiffs' attorney Ward to prosecute the court's sanctions motion at the same time that Ward had his own private sanctions motion pending before the court (as well as related civil proceedings), but also engaged in extensive *ex parte* communications with Ward, ordered Ward not to disclose the substance of the communications with the defendants, and allowed Ward to testify as a fact witness and cross-examine other witnesses during the proceedings.[42] Using these unprecedented procedures and operating under its "inherent powers," the district court imposed serious criminal fines and quasi-criminal disbarment, suspension, and reprimand sanctions on the defendants.

In evaluating these proceedings, the majority correctly concludes that the procedures failed to comport with basic principles of due process with respect to the criminal fines imposed on defendants CNA and Tone. Ironically, notwithstanding this conclusion, the majority holds that the same defective procedures did not violate due process with respect to the quasi-criminal disbarment, suspension, and reprimand of defendants Burns, Bieck, Wright, Fiedler, Burnthorn, and Berry. I respectfully disagree.

---

[42] Although the district court ultimately denied the private sanctions motion one week before issuing its opinion in this case, Ward's motion was pending before the court during the court's investigation and the entirety of the hearings in which Ward played such a vital role.

The majority cites no case where inherent powers sanctions have been imposed or upheld under similar procedures, and I can find none. Indeed, a thorough review of our case law demonstrates that we have reversed and vacated disbarment, suspension, and reprimand sanctions in far less troubling circumstances than those posed by the case at hand.[43]  Moreover, the Supreme Court's decisions in *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 837-38, 114 S. Ct. 2552, 2563-64, 129 L. Ed. 2d 642 (1994), and *Young v. United States*, 481 U.S. 787, 800, 107 S. Ct. 2124, 2133-34, 95 L. Ed. 2d

_____

[43]  *See, e.g., Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 229 (5th Cir. 1998) (reversing and vacating attorney disbarment because the district court failed to provide adequate notice and opportunity to be heard); *Scaife v. Associated Air Center Inc.*, 100 F.3d 406, 412 (5th Cir. 1996) (reversing and vacating attorney reprimand sanction because it was overbroad and excessive in relation to the alleged conduct); *United States v. Brown*, 72 F.3d 25, 29 (5th Cir. 1995) (reversing and dismissing attorney suspension sanction because disciplinary rule must be strictly construed resolving ambiguities in favor of the person charged); *Elliott v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995) (reversing and remanding attorney sanction because the district court failed to make a finding of bad faith); *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995) (reversing attorney sanction because the magistrate judge failed to exercise the mandated restraint before assessing sanctions under the inherent power of the court); *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 340-41 (5th Cir. 1993) (reversing attorney disbarment because the record did not support the district court's bad faith finding); *In re Medrano*, 956 F.2d 101, 103-05 (5th Cir. 1992) (reversing attorney disbarment because the district court applied the preponderance of the evidence rather than clear and convincing evidence standard); *Johnson v. Ayers*, 921 F.2d 585, 586 (5th Cir. 1991) (reversing bankruptcy court's decision to suspend attorney from practice because "a reasonable person would have a reasonable basis for questioning [the judge's] impartiality in the contempt proceeding"); *In re Thalheim*, 853 F.2d 383, 388 (5th Cir. 1988) (reversing attorney suspension because the district court violated due process by failing to follow its own requirements concerning proper disciplinary proceedings).

740 (1987), as well as our own warnings in *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 707-08 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2132, 115 L. Ed. 2d. 27 (1991), mandate a reversal of the quasi-criminal sanctions imposed under such defective procedures.

Accordingly, I dissent from the majority's affirmance of the suspension of attorney-defendant Berry. I concur in the judgment reversing the disbarment, suspension, and reprimand of Wright, Burns, Bieck, Fiedler, and Burnthorn, as well the majority's reversal of the criminal fines imposed on CNA and Tone; I disagree, however, with the majority's approval of the unprecedented procedures that the district court used to impose the suspension, disbarment, and reprimand sanctions under its inherent powers.

I

"A court must, of course, exercise caution in invoking its inherent powers, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *See NASCO*, 501 U.S. at 50, 111 S. Ct. at 2136. Moreover, "the threshold for the use of inherent power sanctions is high." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). "Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Bagwell*, 512 U.S. at 831, 114 S. Ct. at

2259; *see also Mackler Productions, Inc. v. Cohen*, No. 97-7789, 1998 WL 325233, *2-3 (2d Cir. June 22, 1998) ("A troublesome aspect of a trial court's power to impose sanctions . . . pursuant to the court's inherent power . . . is that the trial court may act as accuser, fact finder and sentencing judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed. The absence of limitations and procedures can lead to unfairness or abuse.") (internal citation omitted). In addition, "[t]o the extent that such contempts take on a punitive character [] and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order." *Id.* at 831, 114 S. Ct. at 2559.

Significantly, both the Supreme Court and our own court have emphasized that disbarment is a punishment with punitive characteristics. *See, e.g., In re Ruffalo*, 390 U.S. 544, 550, 88 S. Ct. 1222, 1226, 20 L.Ed.2d 117 (1968) ("Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer."); *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 229 (5th Cir. 1998) ("Although disbarment is intended to protect the public, it is a 'punishment or penalty imposed on the lawyer.'") (quoting *In re Ruffalo*, 390 U.S. at 550, 88 S. Ct. at 1226). We have further concluded that disbarment proceedings are adversarial and quasi-criminal in nature. *See In re Thalheim*, 853 F.2d 383, 388 (5th Cir. 1988) ("Attorney disbarment and suspension cases are quasi-criminal

in character."); *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) ("A disbarment proceeding is adversarial and quasi-criminal in nature and the moving party bears the burden of proving all elements of a violation."); *see also In re Ruffalo*, 390 U.S. at 551, 88 S. Ct. at 1226 ("These are adversary proceedings of a quasi-criminal nature."). Consequently, while disbarment proceedings are "quasi-criminal," rather than purely criminal, we have consistently rejected claims that civil procedural protections are adequate to meet due process requirements. *See, e.g., In re Medrano*, 956 F.2d at 102 (rejecting the district court's application of the preponderance of the evidence standard in a disbarment proceeding); *United States v. Brown*, 72 F.3d 25, 29 (5th Cir. 1995) ("Because attorney suspension is a quasi-criminal punishment in character, any disciplinary rules used to impose this sanction on attorneys must be strictly construed resolving ambiguities in favor of the person charged.").

Furthermore, we must closely scrutinize the district court's use of its inherent powers to insure that the court exercised such powers with restraint and discretion. "Indeed, the Supreme Court has cautioned that '[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion.'" *Chaves*, 47 F.3d at 156 (quoting *NASCO*, 501 U.S. at 44, 111 S. Ct. at 2132); *see also Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406-07 (5th Cir. 1993) (inherent powers must be exercised with restraint and discretion and only sparingly so). "Disbarment being

the very serious business that it is, ample opportunity must be afforded to show cause why an accused practitioner should not be disbarred." *Theard v. United States*, 354 U.S. 278, 282, 77 S. Ct. 1274, 1276-77, 1 L. Ed. 2d 1342 (1957); *see also Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 511, 22 L. Ed. 205 (1873) ("Before a judgment disbarring an attorney is rendered he should have . . . ample opportunity of explanation and defence."). At rock bottom, "ample opportunity" to present a defense to a charge of disbarment must include an *impartial* decision maker and, if one is needed, a *disinterested* prosecutor. *See, e.g., Bagwell*, 512 U.S. at 831-38, 114 S. Ct. at 2559-64; *Young*, 481 U.S. at 800-06; *NASCO*, 894 F.2d at 707-08.

II

A

As the Supreme Court explained in *Bagwell*, "[the] fusion of legislative, executive, and judicial powers [in inherent powers proceedings] summons forth . . . the prospect of the most tyrannical licentiousness" and is "uniquely [] liable to abuse." *Bagwell*, 512 at 831-33, 114 S. Ct. at 2559-61. Accordingly, our jurisprudence requires "progressively greater procedural protections" when sanctions have punitive characteristics (as they do here) and where the conduct giving rise to the sanctions occurs outside the presence of the court and requires elaborate factfinding (as it did here). *See id.* The Supreme Court explained that a district court must be

particularly circumspect in exercising its inherent powers when the proceedings require elaborate factfinding:

> For a discrete category of indirect contempt, however, civil procedural protections may be insufficient. Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding. *Cf. Green*, 356 U.S. at 217 n.33, 78 S. Ct. at 660 n.33 (Black, J. dissenting) (citation omitted) ("Alleged contempts committed beyond the court's presence where the judge has no personal knowledge of the material facts are especially suited for trial by jury. A hearing must be held, witnesses must be called, and evidence taken in any event. And often . . . crucial facts are in close dispute"). Such contempts do not obstruct the court's ability to adjudicate the proceedings before it, and the risk of erroneous deprivation from the lack of a neutral factfinder may be substantial.

*Bagwell*, 512 U.S. at 833-34, 114 S. Ct. at 2560-61 (alteration in original).

Here, as the majority's recitation of the facts demonstrates, the district court was required to make elaborate and detailed factual findings after the presentation of conflicting testimony at the sanctions proceedings (including the testimony of the court's attorney Ward). The conduct giving rise to the sanctions stemmed from a series of complicated, out-of-court, off-the-record, and much disputed events that occurred during settlement negotiations. In fact, the district court conceded that prior to the sanction proceedings, "the court knew none of the facts." The district court attempted to justify the appointment of plaintiffs' attorney Ward by explaining that "the appointment of an attorney was even more important because the court had absolutely no knowledge of the

factual basis for any charges for sanctions."[44] Accordingly, under *Bagwell*, these sanction proceedings were the precise type of situation where the "risk of erroneous deprivation from the lack of a neutral factfinder" was substantial.[45] *See id.* Moreover, as I discuss below, where the district court appointed a self-interested prosecutor who continued to represent the private plaintiffs, communicated *ex parte* (and secretly) with the court-appointed prosecutor, and allowed the prosecutor to testify as a fact witness during the inherent powers proceedings, "the mandated restraint [was] lacking." *Chaves*, 47 F.3d at 156.

B

In *Young v. United States*, under facts decidedly similar to the case at hand, the Supreme Court explained that "the appointment of counsel for an interested party to bring the contempt prosecution . . . at a minimum create[s] opportunities for conflicts to arise, and create[s] at least the appearance of impropriety." *Young*, 481 U.S. at 806, 107 S. Ct. at 2137. The Court explicitly rejected the argument, similar to the one made by the district court and accepted

---

[44] As I discuss *infra* at Part II.B, it is precisely because the district court had no knowledge of the factual basis for any sanctions that the extended *ex parte* communications with Ward, as well as Ward's testimony as a factual witness at the proceedings, violated the strictures of *Young*, *Bagwell*, and *NASCO*.

[45] Although the majority concedes that "an initial impression [of] *Bagwell* appears to mandate" a reversal of the district court's faulty procedures for the disbarment proceedings, *see* Op. at 25, the majority nonetheless approves the very procedures that it concludes violate due process for the criminal fines.

by the majority, *see* Op. at 40 n.23, that appointment of opposing counsel was justified because that person was most familiar with the underlying events.  The Court explained that:

> The potential for misconduct that is created by the appointment of an interested prosecutor is not outweighed by the fact that counsel for the beneficiary of the court order may often be most familiar with the allegedly contumacious conduct.  That familiarity may be put to use in assisting a disinterested prosecutor in pursuing the contempt action, but cannot justify permitting counsel for the private party to be in control of the prosecution.

*Young*, 481 U.S. at 806 n.17, 107 S. Ct. at 2137 n.17.  In unambiguous terms, the Court condemned the practice of appointing a self-interested prosecutor in inherent power contempt proceedings: "If a Justice Department attorney pursued a contempt prosecution for violation of an injunction benefiting any client of that attorney involved in the underlying litigation, that attorney would be open to a charge of committing a felony . . . .  Furthermore, such conduct would violate the ABA ethical provisions, since the attorney could not discharge the obligation of undivided loyalty to both clients where both have a direct interest." *Young*, 481 U.S. at 805, 107 S. Ct. at 2136.  The rule and principles set out in *Young*, particularly in light of Ward's pending motion for private sanctions, his extensive *ex parte* communications with the court, and his testimony as a fact witness, are directly applicable to the case at hand.

The majority attempts to "escape the mandate of *Young*," *see* Op. at 36, by asserting that our decision in *NASCO*, where we allowed the

use of opposing counsel to present evidence on the amount of attorneys' fees, is "largely dispositive" with regard to Ward's service as prosecutor. *See* Op. at 32. I disagree. First, in attempting to draw a parallel to the case at hand, the majority asserts that "the district court in *NASCO* relied primarily on the extensive factual development of the monetary sanctions proceeding in finding Gray disbarrable." *See* Op. at 35 n.19. The record, both here and in *NASCO*, completely refutes this assertion. Indeed, in Judge Scott's own opinion in this case, he explicitly states that in *NASCO* the court did *not* have to rely on any factual development because the court already knew all of the facts before the sanction proceedings started: "This was a more serious case than *NASCO v. Chambers* where the court knew all the facts before trial."[46] Judge Scott then explicitly distinguished the case at hand from *NASCO*, explaining that "[i]n this case the court knew none of the facts. . . . [and] had absolutely no knowledge of the factual basis for any charges for sanctions."

Our own opinion in *NASCO* illuminates the fundamental distinction between this case, where the sanctionable conduct occurred out of court and required elaborate factfinding, and *NASCO*, where it did not: "Since the misconduct alleged occurred in the

---

[46] As the majority notes, Judge Scott was also the presiding judge in the sanctions proceedings in *NASCO*; thus, his own concession that he knew all of the facts before the sanctions proceedings in *NASCO* (and that he knew none of them in the case at hand) is more persuasive than the majority's assertion to the contrary.

court, there was no need for elaborate proof of the facts, and the parties offered none." *NASCO*, 894 F.2d at 707; *see also id.* at 708 ("There is no dispute that the appellants did everything the district court said they did."). Thus, contrary to the majority's conclusion, *NASCO* cannot be read as support for the district court's appointment of an interested opposing counsel who simultaneously testifies as a fact witness to the much-disputed, out-of-court conduct of which the judge has no personal knowledge.

Additionally, in upholding the attorney suspensions in *NASCO*, we specifically distinguished *Young* on the grounds that "the danger present in *Young*, that private counsel would be overzealous in the contempt proceedings in an effort to further the interest of his client" was not present. *See NASCO*, 894 F.2d at 707. We explained that "[t]he arguments of counsel at the hearing were devoted entirely to the issue of monetary sanctions [and] [t]he court relied on its own research . . . in determining the propriety of nonmonetary sanctions [*i.e.,* suspension and disbarment]." *NASCO*, 894 F.2d at 707-08. Because the plaintiff's attorney in *NASCO* played such a limited role in the sanction proceedings, we held that "[t]he court thus avoided placing NASCO's counsel in the role of prosecutor for the disbarment proceedings." *Id.* at 708. Here, we cannot make the same conclusion. Indeed, if there is any case to which the rule in *Young* applies, it is this one.

First, Ward undoubtedly had an interest in the court's sanctions proceedings because he continued to represent the

plaintiffs in related civil proceedings and had his own private motion for sanctions pending before the court at the same time. The majority states that the case here "arguably presents a far less problematic scenario" than in *NASCO* because Ward's private motion was merely pending during the course of his investigation and testimony for the court's sanctions motion. *See* Op. at 37 n.21. I cannot agree that this presents a "far less problematic scenario." In *NASCO*, the opposing counsel's testimony related only to the appropriate amount of attorneys' fees to award; the proceedings did not involve an interested private party arguing the sanctions motion for the district court while he had his own private motion, as well as related civil proceedings, pending before the court. The fundamental problem that the Supreme Court recognized with the appointment of an interested party to prosecute a serious contempt is not diminished simply because the interested party has not yet argued his private motion. *Young* prohibits the inherent conflict of interest, and more importantly, the appearance of impropriety, that arises when an interested private party prosecutes the contempts. *See Young*, 481 U.S. at 807, 107 S. Ct. at 2137 ("Regardless of whether the appointment of private counsel in this case resulted in any prosecutorial impropriety (an issue on which we express no opinion), that appointment illustrates the potential for private interest to influence the discharge of public duty.").

Moreover, the district court compounded its error and the appearance of impropriety by having extensive *ex parte*

communications with Ward.  *See* MODEL CODE OF JUDICIAL CONDUCT Canon 3(B)(7) (1990) ("A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . .").  Although the majority states that the *ex-parte* contacts in this case were limited "to the most de minimis and harmless procedural matters," *see* Op. at 43, the record belies this contention.  The district court's own opinion documents several of the *ex parte* communications between Ward and the court:

> Thereafter, we had several long conversations with Mr. Ward trying to determine what action should be taken addressing this matter and emphasizing the fact that the court knew absolutely nothing of the alleged fraud in the settlements . . . .
>
> Naturally we called Ward on several occasions but he knew of no facts to support his allegations of fraud.
>
> We both felt that considering the experience and character of the attorneys in this suit, a chance should be given to those who were not involved to clear themselves without being openly accused and forced to defend themselves in court.

*See Crowe v. Smith*, No. 92-2164, slip. op. at 32-33 (W.D. La. July 25, 1996).

Moreover, the district court gave Ward explicit instructions not to disclose the nature of the *ex parte* communications to the defendants and denied several motions by the defendants seeking to be apprised of the nature of these communications.  In light of the three hats worn by plaintiffs' attorney Ward (*i.e.*, prosecutor, fact witness, and private attorney for the opposing party), the district

court's secret *ex parte* communications with the private prosecutor create an overwhelming appearance of impropriety. *Cf. Bagwell*, 512 U.S. at 833-34, 114 S. Ct. at 2560-61 (setting forth the circumstances under which the risk of erroneous deprivation from the lack of a neutral factfinder is substantial). The majority attempts to avoid this conclusion by analyzing the *ex parte* communications independently, as if they did not occur in the context of the inherent powers contempt proceeding where Ward was acting as the prosecutor as well as testifying before the court. *See* Op. at 37-38 ("With the exception of the issues of attorney testimony and *ex parte* contacts discussed separately below, we can find no serious deviation from the procedure expressly approved in *NASCO* . . . ."). Because inherent powers "must be exercised with restraint and discretion," *NASCO*, 501 U.S. at 44, 111 S. Ct. at 2132, the majority errs in failing to consider the *ex parte* communications in the appropriate context and in conjunction with the other procedural deficiencies.

The majority's citation to the "extensive tradition of affording little or no weight to isolated *ex parte* contacts," *see* Op. at 41-43, n.24 & n.25, provides no support for approving the extensive and secret *ex parte* communications in the case at hand. Significantly, none of the cases cited by the majority involve the district court's exercise of its inherent powers. Furthermore, none of the cases involve *ex parte* communications with the attorney acting as a private prosecutor for the court; none of the cases

involve *ex parte* communications with an attorney who had a private sanctions motion and civil claims pending before the court; and none of the cases include *ex parte* communications with an attorney who also testified as a major fact-witness in the proceedings.

Finally, although Ward prosecuted the sanctions on behalf of the court, he also testified as a fact-witness during the disbarment proceedings. For obvious reasons, the Rules of Professional Conduct prohibit attorney testimony under most circumstances. *See* Louisiana Rules of Professional Conduct Rule 3.7(a) (1995 ed.) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ."). Once again, the majority attempts to analyze this error independently, instead of in the context of *Young*, *Bagwell*, and *NASCO*. The majority cites a "wide swath" of district court and bankruptcy court cases for the general proposition that the rule barring attorney testimony does not apply when testimony is "made to a judge, not a jury." *See* Op. at 38-40. It is significant to note, however, that none of the cases cited by the majority involve a testifying attorney who is also the prosecutor appointed by the court. The same fear that leads us to bar attorney testimony in jury trials))*i.e.* that the factfinder (the jury) would tend to believe the testifying attorney more than an ordinary witness))applies when the testifying attorney represents the factfinder (here, the court) rather than (as normal) a private party. As the Supreme Court noted in *Bagwell*, "the risk of erroneous deprivation from the lack of a neutral factfinder" is

greatest when, like here, the judge has no personal knowledge of the material facts that are the basis for the sanctions. *See Bagwell*, 512 U.S. at 834, 114 S. Ct. at 2560-61; *see also id.* at 831-32, 114 S. Ct. at 2559 ("Contumacy often strikes at the most vulnerable and human qualities of a judge's temperament, and it's fusion of legislative, executive, and judicial powers summons forth . . . the prospect of the most tyrannical licentiousness.") (internal quotations and citations omitted) (alterations in original).

III

After a thorough search of the relevant case law, I have found no case in which a district court used procedures like the ones here to impose inherent powers sanctions, let alone where such procedures were upheld on appeal. Particularly where the district court appoints the interested opposing attorney to prosecute the contempt, engages in secret *ex parte* communications with the attorney, and allows the attorney to testify as a fact witness, this court errs in condoning the district court's use of its inherent powers. *See NASCO*, 501 U.S. at 44, 111 S. Ct. at 2132 ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). In light of these unprecedented and unparalleled procedures, I conclude that the district court failed to provide due process in imposing the disbarment, suspension, and reprimand sanctions. In direct contradiction of our warning in *NASCO*, the district court here "plac[ed] [plaintiff's] counsel in the role of prosecutor for the disbarment proceedings." *NASCO*, 894 F.2d at 708.

Accordingly, I respectfully dissent from the majority's affirmance of the suspension of attorney-defendant Berry and its approval of the proceedings used in this case.